2006 WY 14

**MULLINNIX LLC, Appellant (Plaintiff),**

**v.**

**HKB ROYALTY TRUST, c/o H. Kirk Brown, III, Trustee; Jaw Royalty Trust, Jill A. Wiltse, Trustee; Louis A. Oswald, III, Trustee of the Oswald Family Trust Dated April 27, 1998; Jonathan S. Roderick; Lynne M. Baalman and Mark E. Baalman, wife and husband; High Plains Associates, Inc.; Jimmie E. Parnell and Nancy Parnell, Husband and Wife; First Interstate Bank of Commerce and Mildred B. Parnell as co-trustees of the Parnell Primary Trust; Pennaco Energy, Inc.; Barrett Resources Corporation; Lance Oil and Gas Company, Inc.; Kenneth A. Schienker; William M. Fulton, III; Tongue River Royalties; M & M Oil and Gas Properties, LLC; Jimmie E. Parnell, individu-**

ally; U.S. Bank National Association, NA; Mary Jo Schuman; Brian Lute Morton; William Dake Morton, a/k/a William Duke Morton; Mildred Smith; William W. Higgins and Barbara Lee Higgins, Husband and Wife; Michael Bennett, Attorney-in-fact for Mary Frances Bennett; Bank One, f/k/a The First National Bank of Chicago, NA; Don McDonald, Successor Trustee; Vernon A. Johnson and Teresa F. Johnson, Husband Wife; Richard E. Frazey; Mildred B. Parnell, Trustee of the Parnell Trust; First Interstate Bank, as Trustee of the Parnell Trust; Tower Colombia Corporation; Marshall C. Crouch III; Jane R. Crouch; Quantum Energy; Mike J. Coulter and Shirley P. Coulter, Husband and Wife; Mildred B. Parnell and First Interstate Bank of Commerce, Co-trustees with Reginald R. Parnell, deceased, of the Reginald R. Parnell Trust Dated April 5, 1976; Mildred B. Parnell and First Interstate Bank of Commerce, Co-trustees with Reginald R. Parnell, deceased, of the Mildred B. Parnell Trust Dated April 5, 1976; Mabel K. Rothwell, Widow of James L. Rothwell, a/k/a Jim Rothwell, deceased; Mabel K. Rothwell, as successor in interest, Heir and Beneficiary of Jim Rothwell, a/k/a James L. Rothwell, individually; and North Finn, LLC, Appellees (Defendants).

John W. Hickman; Fred Boyce, Jr., Personal Representative of the Estate of Fred J. Boyce; and Lane Boyce, Appellants (Defendants),

v.

Bernice Groves; James E. Drake; and Edra June Drake, Appellees (Plaintiffs).

Nos. 05–80, 05–81.

Supreme Court of Wyoming.

Jan. 24, 2006.

Representing Appellants: Cameron S. Walker of Schwartz, Bon, Walker & Studer, LLC, Casper, Wyoming.

Representing Parnell Appellees: James L. Edwards of Stevens, Edwards, Hallock & Carpenter, P.C., Gillette, Wyoming.

Representing Appellee Pennaco Energy, Inc., S. Thomas Throne of Throne & Hurst, Sheridan, Wyoming.

Representing Appellees: Kendal R. Hoopes and Jay A. Gilbertz of Yonkee & Toner, Sheridan, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

KITE, Justice.

[¶ 1]  The dispositive issue in this case was whether deeds reserving "oil rights" which were executed in the 1940s in Campbell County, effectively reserved gas rights without a specific reference to "gas."  In these consolidated appeals, Mullinnix, LLC and John W. Hickman, Fred J. Boyce and Lane Boyce (hereinafter referred to as Hickmans) contest the district court's order quiet-

ing title in gas rights in the appellees. The district court examined extrinsic evidence of the trade usage of the term "oil rights" at the time and place of the execution of the deeds and concluded the term, as used in real estate documents, did not include the gas rights. In the Mullinnix case, the district court also concluded that a document entitled "Declaration of Interest" executed in 1968, long after the deed was executed, by the grantees in the deed in question did not operate as a waiver or to estop them from asserting their full interest in the gas estate. We agree with the district court's conclusions and, therefore, affirm.

## ISSUES

[¶ 2]   Case numbers 05–80 and 05–81 were consolidated for a bench trial and, also, on appeal. Appellants Mullinnix and Hickman filed a single brief. They articulate the issues on appeal as follows:

1.   Was the Court's decision that reservations of "oil rights" exclude gas contrary to the evidence introduced at trial[?] Did the Court intentionally ignore relevant evidence and rely on inadmissible evidence in reaching its conclusion? (*Mullinnix* and *Hickman* cases)

2.   In analyzing evidence to decide that a reservation of "oil rights" excluded gas, did the Court fail to follow the precedent and process set forth by the Court in *Hickman v. Groves*, [2003 WY 76,] 71 P.3d 250 [256] [ (Wyo.2003) ]? (*Mullinnix* and *Hickman* cases)

3.   Did the Court err by allowing an expert opinion from attorney Edward Halsey interpreting deeds when that was the job of the Court, and Mr. Halsey refused to apply the decision of *Hickman v. Groves* to his analysis? (*Mullinnix* and *Hickman* cases)

4.   Did the Court erroneously exclude evidence of conduct of parties to the deeds and their successors in interest demonstrating that they considered a reservation of "oil rights" to include "gas" as well? (*Mullinnix* and *Hickman* cases)

5.   Did the Court ignore the evidence and decide contrary to the evidence when it held that Johny Mullinnix did not have sufficient detrimental reliance to invoke the doctrine of equitable estoppel, and thereby preclude the Parnells and their successors in interest from disavowing the Declaration of Interest? (*Mullinnix* case)

6.   Since actual consideration was recited and paid for the Declaration of Interest, was detrimental reliance necessary in order to give effect to the Declaration of Interest? (*Mullinnix* case)

7.   Did the Court improperly curtail the evidence so that Mullinnix was unable to prove detrimental reliance upon the representations of the Parnells and their attorney, Tom Morgan, that the Declaration of Interest would be signed before allowing his draft to be paid and filing the mineral deed he had taken from the Rothwells? (*Mullinnix* case)

8.   In light of the foregoing evidence, which should have been admitted, and the evidence which was admitted, was it error for the judge to conclude that Mullinnix did not rely on a Declaration of Interest before allowing the 10–day draft issued for the mineral interest in the property to be paid and filing the Rothwell mineral deed? (*Mullinnix* case)

9.   Did the Court err as a matter of law when it determined that the Declaration of Interest was not a waiver or an estoppel of record? (*Mullinnix* case)

10.   Did the Court err by failing to apply the doctrine of laches to prevent the Parnells and their successors in interest from disavowing the Declaration of Interest? Should the doctrine be applied as a matter of law to this case? (*Mullinnix* case)

11.   Should the Parnells and their successors in interest be estopped as a matter of law by the fact of signing and providing the Declaration of Interest

for filing of record in the records of the County Clerk? (*Mullinnix* case)

12. Is the Court's decision that the Declaration of Interest was not a waiver erroneous as a matter of law contrary to the evidence? (*Mullinnix* case)

13. Did the Court err by interpreting a reservation of "oil and commercial gravel rights" to be a reservation of "oil", but not "oil rights"? (*Hickman* case)

14. Should the reservation of "oil rights" include coalbed methane gas? (*Mullinnix* and *Hickman* cases)

[¶ 3] Appellees Pennaco Energy, Inc., Groves, and Parnells filed separate briefs on appeal. Pennaco identified the issues on appeal as:

1. Did the reservation of "oil" rights in the 1947 deed also include a reservation of "gas"?

2. Does a document without words of conveyance (the Declaration of Interest) recorded 20 years after the date of the deed change ownership transferred by the deed?

3. Should "circumstances surrounding" an unambiguous document be considered when determining the intent of the parties to a deed?

Parnells restate the issues as:

[1.] Did Appellant meet his burden of proof that "oil rights" includes "gas"?

[2.] Was the decision of the District Court that "oil rights" means "oil" and does not include "gas" substantiated by the evidence presented?

Groves phrases the appellate issues as follows:

1. Whether the District Court's determination that the reservation of "oil and commercial gravel rights" did not include gas or coalbed methane gas, is supported by the evidence.

2. Whether the District Court followed the process outlined in *Hickman v. Groves*, 2003 WY 76, 71 P.3d 256 (Wyo.

2003), in interpreting the warranty deed.

## FACTS

### Case No. 05–81

[¶ 4] On October 14, 1944, Jerry Hickman and Effie Hickman executed a warranty deed conveying real property located in Campbell County to Ed Willard, but reserving "to the grantors one-half of all oil and commercial gravel rights" in the property. Hickmans are the successors in interest to Jerry and Effie Hickman; and Bernice Groves, James Drake, and Edra June Drake (hereinafter referred to as Groves) are the successors in interest to Mr. Willard.

[¶ 5] On July 20, 2001, Groves filed an action seeking to quiet title to all coal bed methane gas (CBM)[1] underlying the subject real property. Hickman filed a counterclaim seeking a declaration that they owned one-half of all of the gas, including CBM, underlying the property pursuant to the reservation of "oil rights" contained within the warranty deed. Hickmans contended the term "oil rights" had a particular meaning when the deeds were executed in 1944 in Campbell County, which included gas and they filed affidavits supporting that contention. The district court granted summary judgment in favor of Groves, ruling that the warranty deed was unambiguous and, as a matter of law, the reservation of "oil rights" did not include a reservation of gas rights. *Hickman v. Groves*, 2003 WY 76, ¶¶ 3–4, 71 P.3d 256, 256–57 (Wyo.2003).

[¶ 6] Hickmans appealed the summary judgment, and this Court reversed and remanded for a trial, finding a question of fact was raised concerning whether "oil rights" had a particular trade usage at the time the deed was executed. We ruled, although the term "oil rights" is unambiguous on its face, facts had been alleged showing that the trade usage of the term "oil rights" included gas and, therefore, suggested the true intent of the grantors was to reserve gas, as well as

---

1. In our earlier decisions, we thoroughly discussed the properties of coal bed methane and concluded it is chemically no different than other types of natural gas. *See, e.g., Newman v. RAG*

*Wyoming Land Co.*, 2002 WY 132, ¶¶ 9–10, 53 P.3d 540, 543 (Wyo.2002) (discussing the chemistry of coal and coalbed methane).

oil. *Id.*, ¶ 10, 71 P.3d at 259. We reasoned: "In interpreting unambiguous contracts involving mineral interests, we have consistently looked to surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract." *Id.*, ¶ 6, 71 P.3d at 258. Consistent with our decisions in *Newman v. RAG Wyoming Land Co.*, 2002 WY 132, 53 P.3d 540 (Wyo.2002), and *McGee v. Caballo Coal Co.*, 2003 WY 68, 69 P.3d 908 (Wyo.2003), the court must focus on the general intent of the parties, concentrating on the purpose of the grant or reservation "in terms of the respective manner of enjoyment of surface and mineral estates and the exploitation of the mineral resources involved." *Hickman*, ¶ 7, 71 P.3d at 258. We, therefore, remanded the case to the district court for a trial to consider extrinsic evidence to resolve the issue of fact regarding the trade usage of the term "oil rights" at the time and place of execution of the deeds. *Id.*, ¶ 16, 71 P.3d at 262.

### Case No. 05–80

[¶ 7] On May 8, 1947, James and Vida Rothwell executed a warranty deed conveying certain property in Campbell County to R.D. and Mary Parnell. The Rothwells reserved "one half of all the oil rights" in most of the property and "one fourth of the oil rights" in the remainder of the property. In 1968, Johny Mullinnix, acting on behalf of Mullinnix 67 Associates, contacted the Rothwells regarding their mineral interests. Mullinnix, LLC is the successor in interest to Mullinnix 67 Associates. On August 6, 1968, the Rothwells signed a mineral deed conveying their mineral interests to Mullinnix. In consideration for the mineral deed, Mullinnix executed a $24,000 draft, payable to the Rothwells through the Lusk State Bank. The draft was a ten-day sight draft and was specifically subject to Mullinnix's approval of the title to the property. The Rothwells deposited the draft on August 7, 1968, and on August 13, 1968, Mr. Mullinnix sent a check and a letter to the Lusk State Bank, instructing it to pay the draft on its due date unless

he informed it otherwise. Mr. Mullinnix did not provide other instructions to the bank prior to its due date, and the draft was paid according to its terms. The mineral deed was recorded on August 15, 1968.

[¶ 8] Mr. Mullinnix conducted a title search after the mineral deed was executed and before the draft was paid and discovered the Rothwells had reserved an interest in "oil rights." He was concerned the reservation created some uncertainty as to the status of the gas rights. Consequently, he contacted the Parnells in an effort to clarify the matter. R.D. Parnell had passed away, leaving Mary Parnell and her son and daughter-in-law, Reginald and Mildred Parnell, as the holders of the Parnell mineral interests.[2] Mr. Mullinnix prepared a document entitled "Declaration of Interest" for the Parnells' signatures, which stated the Parnells owned an undivided one-half interest in the oil, gas and associated hydrocarbons and other minerals in certain property and an undivided one-fourth interest in the oil, gas and associated hydrocarbons and other minerals in other property. The Parnells directed their attorney to review the Declaration of Interest document. Their attorney struck the "other minerals" language from the declaration, leaving the reference to "oil, gas, and associated hydrocarbons." The Parnells signed the Declaration of Interest on August 20, 1968, and it was recorded in the Campbell County Clerk's Office on August 27, 1968.

[¶ 9] On March 14, 2001, Mullinnix LLC filed an action in the district court for a declaratory judgment and to quiet title to the mineral interests it acquired through its transaction with the Rothwells. In particular, Mullinnix sought a declaration as to its title in the gas estate. The parties recognized the issues presented in the Mullinnix case were very similar to the issues in the Hickman case. Thus, the district court stayed proceedings in the Mullinnix case, pending this Court's decision on the Hickman appeal.

---

**2.** The other appellees in Case No. 05–80, apparently, claim various interests deriving from the Parnells.

### Consolidated cases

[¶ 10] After we reversed the summary judgment in *Hickman,* the district court consolidated the Mullinnix and Hickman cases. The district court held a bench trial on the consolidated cases in October 2004. It subsequently issued its findings of fact, conclusions of law, and judgment. In accordance with this Court's opinion in *Hickman,* the district court considered evidence relevant to whether the term "oil rights" had a particular trade usage, which included gas, at the time the deeds were executed. The district court concluded: "Local usage in Campbell County during the 1940s was such that both oil and gas were specifically referred to when used to reserve interests in mineral deeds." As to both deeds, the district court ruled the grantors reserved the oil rights, in the relevant percentages, but conveyed the gas rights, including the rights to CBM.

[¶ 11] In the Mullinnix case, the district court originally granted a summary judgment to Mullinnix, finding the Declaration of Interest had "achieved its stated intent of clarifying the interests held, and that as a result the Plaintiff had thereafter relied upon it, and entered summary judgment for Plaintiffs." After the Hickman case was reversed by this Court, the district court withdrew its summary judgment on the Declaration of Interest. After the trial, the district court ruled Mullinnix's claims of estoppel and waiver pursuant to the Declaration of Interest were not supported by the evidence. Hickman and Mullinnix filed timely notices of appeal from the district court's findings of facts, conclusions of law and judgment.

### STANDARD OF REVIEW

[¶ 12] The district court heard these cases without a jury. We, therefore, apply our standard for reviewing decisions made by a district court following a bench trial:

> "The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge

to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

*Harber v. Jensen,* 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004) quoting, *Life Care Centers of America, Inc. v. Dexter,* 2003 WY 38, ¶ 7, 65 P.3d 385, 389 (Wyo.2003). *See also Powder River Ranch, Inc. v. Michelena,* 2005 WY 1, ¶ 8, 103 P.3d 876, 879–80 (Wyo.2005). Further, with regard to the trial court's findings of fact,

> "we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law."

*Harber,* ¶ 7, 97 P.3d at 60. The district court's conclusions of law are, however, subject to our *de novo* standard of review. *Powder River Ranch,* ¶ 8, 103 P.3d at 879–80; *Double Eagle Petroleum & Mining Corp. v. Questar Exploration & Production Co.,* 2003 WY 139, ¶ 6, 78 P.3d 679, 680–81 (Wyo.2003).

### DISCUSSION

### Interpretation of Terms of the Deeds

[¶ 13] In *Hickman,* we concluded a genuine issue of material fact existed regarding whether the term "oil rights" as used in the Hickman/Willard deed had a particular trade usage at the time and place of the deed's execution. *Hickman,* ¶ 10, 71 P.3d at 259. Quoting 11 Samuel Williston, *A Treatise on the Law of Contracts,* § 32:7 (4th ed.1999), we stated: "... circumstances known to the parties at the time they entered into the contract, such as what that industry considered to be the norm, or reasonable or prudent, should be considered in construing a contract, while the parties' statements of

what they intended the contract to mean are not admissible." *Hickman*, ¶ 13, 71 P.3d at 260. Thus, we directed the district court to consider the circumstances surrounding execution of the deed to determine whether "oil rights" was a term of widely known custom and usage in Campbell County in the 1940s which included the "gas rights" without specifically mentioning the word "gas." *Hickman*, ¶¶ 10–11, 16, 71 P.3d at 259–60, 262.

[¶ 14] After the trial, the district court ruled Mullinnix and Hickmans did not satisfy their burden of proving use of the term "oil rights"[3] in deeds in Campbell County in the 1940s had a particular trade usage which included the "gas rights." As properly recognized by the district court, the party asserting a particular trade usage of a term has the burden of proving the existence of the trade usage. *Mountain Fuel Supply Company v. Central Engineering & Equipment Company*, 611 P.2d 863, 869 (Wyo. 1980). The Restatement (Second) of Contracts § 222 (1981) gives guidance in defining a "usage of trade" as: "a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement."

[¶ 15] The grantors in both deeds, the Hickmans and the Rothwells, were involved in the ranching business when they conveyed the property. Mullinnix and Hickmans attempted to prove that ranchers, who may not have been highly educated or sophisticated, often referred to their entire bundle of minerals rights as "oil rights" without distinguishing between oil and gas. Consequently, they maintained the use of the term "oil rights" in the deeds was meant to include the gas, as well as the oil. The appellees agreed that, in the 1940s, people may have used the term "oil rights" in casual conversation to mean a broader variety of mineral rights. Nevertheless, they claimed, in formal documents such as deeds, landowners (including ranchers) were more specific and described with particularity the interests being conveyed and/or reserved. Thus, according to the appellees, the term "oil rights" was used in the deeds to mean simply that—oil and not gas.

[¶ 16] In deciding whether Mullinnix and Hickmans had satisfied their burden of proof, the district court considered the understanding of persons who had occasion to negotiate land transactions at the time the deeds were executed. In that regard, the district court found:

\* \* \* \*

5. During the 1940s, the production of oil was the primary consideration for all concerned in northeastern Wyoming. At the time, natural gas was not considered a commercial product in northeastern Wyoming primarily due to the lack of pipelines and associated production and storage infrastructure. Gas then produced in northeastern Wyoming was solely the by-product of the production of oil and was customarily "flared," that is, simply burned off as a by-product of the oil production process.

6. While the general term "oil rights" was undoubtedly used during the 1940s in Campbell County during informal discussions to refer to the bundle of rights associated with surface and subsurface holdings, warranty deeds recorded during the period habitually referred with more exacting specificity to those substances being reserved by the grantor in a conveyance. Common language employed to reserve interests included language such as "reserving unto the grantor one-half of the oil and gas rights"; or "reserving unto the grantor, all oil, gas, and other minerals." Where the grantor sought to

---

**3.** The Hickman/Willard deed reserved "oil and commercial gravel rights." Hickmans argue that the district court ruled the adjective "oil" did not modify the noun "rights." Hickmans maintain, therefore, that the district court improperly concluded that the language in the Hickman deed reserved only "oil" and not "oil rights." While there was some testimony from one of witnesses at the trial, who was an attorney, that the deed reserved "oil" rather than "oil rights," the district court's decision letter clearly indicated that it did not rely on a grammatical parsing of the language in reaching its decision. It interpreted both deeds as reserving "oil rights." The Hickmans' allegation of error in that regard is, therefore, unfounded.

reserve only an interest in the oil, language such as "the first parties reserve an undivided one-half interest in all oil that may be found in or under the surface of said land"; "reserving unto the grantors one-half of all the oil rights"; or "grantors reserving, however, an undivided one-half interest in all oil and minerals (not gas) in, and under or appertaining to said premises," was employed.

7. The better weight of credible evidence presented at trial includes that, where the 1940s grantor intended to reserve an interest in oil *and* gas, language *in a deed* reservation referring to *both* "oil" and "gas" was customary and was the language expected by those examining deeds for title purposes.

8. Similarly, the weight of credible testimony at trial established that the reasonably prudent party to a conveyance would not have relied on the common parlance to provide that a reservation of "oil rights" in a deed included gas or other minerals. Instead, the credible testimony presented indicated that a 1940s era reservation of "oil rights" *in a deed* probably would not have included a reservation of gas or other minerals.

(emphasis in original).

[¶ 17] The testimony and documentary evidence presented at the trial supports the district court's findings.[4] Several landmen and attorneys who worked in the minerals industry during that time testified at the trial about their experiences in Campbell County in the 1940s and 1950s. Obviously, persons who dealt in the minerals trade during that era were elderly at the time of the trial in 2004. Still, the witnesses testified people knew the difference between oil and gas at that time. They also testified the term "oil rights" was sometimes used as a colloquialism or short-hand in casual conversation to mean the broader bundle of mineral rights.

[¶ 18] Nevertheless, the witnesses consistently testified that, when used in legal documents such as deeds, parties did not routinely use the term "oil rights" to mean "oil and gas" or the entire bundle of mineral rights. Instead, the interests at stake in a conveyance or reservation were described with particularity. Numerous documents of conveyance offered into evidence showed the use of specific descriptions of different mineral interests. For example, the trial evidence included several deeds of that era which included specific references to "oil and gas" or specifically exempting "gas." Furthermore, the attorneys and the landmen testified that, if they encountered a deed which included the term "oil rights" during that time, they would have taken some type of action to correct or "cure" what they perceived as a problem with the title.

[¶ 19] Mullinnix and Hickmans attempted to prove the grantors in each deed, i.e. Jerry and Effie Hickman and James and Vida Rothwell, were simple ranchers with limited education, suggesting that they would have used the colloquial or slang term "oil rights" to mean all of the minerals or, at least, the "oil and gas" in their deeds. Thus, they offered testimony about the experiences and education of the grantors. The relevance of that evidence to the ultimate inquiry, i.e. whether "oil rights" had a particular trade usage which included gas rights, was not, however, shown at trial. Simply because the grantors were ranchers of limited education and/or experience and may have used the term "oil rights" to mean oil and gas in casual conversation, does not mean that they would use the term "oil rights" in a legal document to mean "oil and gas" or the entire bundle of mineral rights. In fact, the evidence presented at the trial expressly refuted that leap in logic. An oil and gas lease executed by the Rothwells prior to the deed at issue in this case contained separate specific references to their oil and gas interests, indicating the Rothwells understood well the

---

4. Mullinnix and Hickmans argue in various places in their brief certain testimony and documentary evidence was improperly admitted or excluded by the district court at trial. Their arguments are little more than perfunctory, with little in the way of cogent authority or citation to pertinent authority. Moreover, they do not explain how these alleged evidentiary errors impacted the district court's decision or prejudiced their case. We, therefore, decline to consider their contentions. *See Johnson v. Reiger*, 2004 WY 83, ¶ 9, n. 1, 93 P.3d 992, 996 (Wyo.2004).

distinction between their interests in the different hydrocarbons. In addition, an 83–year–old Campbell County rancher, Charles Christensen, testified landowners in the 1940s may have referred to their mineral rights as oil rights in casual conversation, but they had a very good understanding of the scope and nature of the property they owned and were very specific when describing the property they bought or sold in formal documents. He also provided an analogy which is instructive to our analysis in this case. He testified that ranchers often referred to their cattle herds generically as "cows" in conversation, but when they were buying or selling the livestock, they would particularly describe them as "steer calves, heifer calves, cows," etc. in the bills of sale.

[¶ 20] Substantial evidence supported the district court's conclusion that the term "oil rights" in the deeds did not include "gas." Mullinnix and Hickmans did not meet their burden of proving the term "oil rights" was used with such regularity in deeds in the 1940s in Campbell County to mean both oil and gas that a person intending to include oil and gas in a conveyance would have used the language "oil rights."

[¶ 21] On appeal, appellee Pennaco specifically requests we revisit decisions in which we stated that, even when the language of a deed is unambiguous, the court should consider the "surrounding circumstances" in determining the meaning of its terms. See e.g., *Caballo Coal Company v. Fidelity Exploration & Production Company*, 2004 WY 6, ¶ 11, 84 P.3d 311, 315 (Wyo. 2004); *Newman*, ¶ 11, 53 P.3d at 544, *McGee*, ¶ 12, 69 P.3d at 912. Pennaco argues this interpretive procedure introduces too much uncertainty into real property title. It insists deeds should be interpreted differently than typical contracts because persons other than the parties to the deeds rely upon them. In order to remedy this situation, Pennaco urges us to announce that, henceforth, so long as the language is not ambiguous on its face, the court should establish the "plain meaning" of the language as a matter of law. It argues such a procedure would foster certainty in real estate law and allow persons examining the title to rely upon their understanding of the plain meaning of the recorded documents in determining where title reposes. The district court's decision letter after the bench trial in this case indicates it shares Pennaco's view.

[¶ 22] In responding to this issue, we start with a reminder that the ultimate goal of our interpretation of any contract, including a deed, is to discern the intention of the parties to the document. See, e.g., *Caballo Coal Company*, ¶ 11, 84 P.3d at 314–15; *Newman*, ¶ 11, 53 P.3d at 544; *McGee*, ¶ 10, 69 P.3d at 912. In doing so, we look first to the plain meaning of the words of the deed. *Id.* This has long been the law in Wyoming. See, e.g., *Balch v. Arnold*, 9 Wyo. 17, 29, 59 P. 434, 436 (1899); *Witzel v. Witzel*, 386 P.2d 103, 107 (Wyo.1963); *Dawson v. Meike*, 508 P.2d 15, 18 (Wyo.1973).

[¶ 23] Pennaco and the district court insist allowing extrinsic evidence of the "surrounding circumstances" of a deed in order to determine the meaning of its terms is a new development in Wyoming law. However, a careful examination of our case law reveals it has long been the law that we look to the meaning of terms at the time of execution of an unambiguous deed. In 1899, we stated in *Balch*, 9 Wyo. at 29, 59 P. at 436: "The rule in such cases [involving deed interpretation] is that the intention of the parties is to be ascertained by considering all the provisions of the deed, *as well as the situation of the parties*, and then to give effect to such intention if practicable." (emphasis added). Understanding the importance of the use of "surrounding circumstances" evidence is not difficult when you take into account the definition of "plain meaning" as used in contract interpretation cases. The "plain meaning [of a contract's language] is that 'meaning which [the] language would convey to reasonable persons *at the time and place of its use.*'" *Newman*, ¶ 12, 53 P.3d at 544, quoting *Moncrief v. Louisiana Land and Exploration Company*, 861 P.2d 516, 524 (Wyo.1993) (emphasis added). If we were to adopt Pennaco's position, real property documents would be interpreted in accordance with the meaning of terms as the court understands them *at the time and place of interpretation* of the document

rather than at the *time and place of the execution* of the document.

[¶ 24] The case of *Boley v. Greenough*, 2001 WY 47, 22 P.3d 854 (Wyo.2001), illustrates the importance of examining a conveyance of mineral interests *at the time and place of execution*. Thirty years after the Greenough parents had conveyed royalty interests to their children, a dispute arose because one provision of the assignments used the term "overriding royalty" when the grantors were not leaseholders or overriding royalty owners at the time of the assignments. Some of the confusion in *Boley* resulted from the evolution of the term "overriding royalty" in oil and gas law. In resolving the dispute, we emphasized the importance of interpreting the language of a conveyance at the time and place of its execution in order to effectuate the intentions of the parties to the conveyance. *Boley*, ¶¶ 14–22, 22 P.3d at 858–60.

[¶ 25] The district court's decision letter seems to suggest, by considering extrinsic evidence of the "surrounding circumstances" of a deed's execution, we endorse a violation of the parol evidence rule. Those statements indicate a misunderstanding of the parol evidence rule, which is a rule of substantive law rather than a rule of evidence. *See, e.g., Bowen v. Korell*, 587 P.2d 653, 656 (Wyo.1978). It originated in the doctrine of merger, which states: "[A]ll provisions in a contract are merged into the deed when executed and delivered except those covenants which are deemed to be collateral to the sale. Thus, the deed regulates the rights and liabilities of the parties." *Bakken v. Price*, 613 P.2d 1222, 1227 (Wyo. 1980), quoting 8A *Thompson on Real Property*, § 4458, p. 331. *See also Bixler v. Oro Management, L.L.C.*, 2004 WY 29, ¶ 13, 86 P.3d 843, 848 (Wyo.2004).

"The parol evidence rule has been stated in many ways but the basic notion is that a writing intended by the parties to be a final embodiment of their agreement may not be contradicted by certain kinds of evidence. A writing that is final is at least a partial integration. If the writing is final and also complete, it is a total integration and may not only not be contradicted by the type of evidence in question but may not even be supplemented by consistent (non-contradictory) additional terms. If it is final and incomplete it may be supplemented by consistent additional terms."

*Longtree, Ltd. v. Resource Control International, Inc.*, 755 P.2d 195, 204 (Wyo.1988), quoting, J. Calamari and J. Perillo, *Law of Contracts*, § 3–2 at 135–36 (3d ed.1987). Consequently, the function of the parol evidence rule is to prevent parties from supplementing or contradicting the terms of the contract. *See* Restatement (Second) of Contracts § 231; E. Allan Farnsworth, *Contracts*, §§ 7.2 through 7.7 (3d ed.1999). Once the terms of the agreement are identified, the parol evidence rule ceases to operate. The rule does not prohibit use of extrinsic evidence of the circumstances surrounding the execution of the deed to interpret the meaning of its terms. *Id.* By allowing evidence of the circumstances surrounding execution of the deed, courts are more apt to arrive at the parties' true intention at the time of the execution of the deed.

[¶ 26] The proper role of the parol evidence rule was recognized by the Wyoming legislature when it adopted the Uniform Commercial Code, Wyo. Stat. Ann. §§ 34.1–1–101 through 34.1–10–104 (LexisNexis 2005). The Uniform Commercial Code specifically allows evidence of "usage of trade" to be considered in interpreting a contract. *See* § 34.1–1–205; *Century Ready–Mix Company v. Lower & Company*, 770 P.2d 692, 696–97 (Wyo.1989). "Custom and usage of a particular place or trade can be proved to give to the words of a written contract a meaning different from that which would be given to the words by their more general usage" without violating the parol evidence rule. 6 Arthur Linton Corbin, *Corbin on Contracts* § 579 (2002). In *Hickman*, this Court quoted, at length, Williston's esteemed treatise on contracts, which discusses the proper application of evidence of custom and usage in determining the meaning of contract terms. In light of Pennaco's argument and the district court's decision letter, we think parts of that discussion bear repeating.

"Historically, it has been recognized that familiar words may have different meanings in different places and that every contract will therefore have a relation to the custom of the country where it is made....

[I]n subsequent years, numerous cases were decided where words with a clear normal meaning were shown by usage to bear a meaning which was not suggested by the ordinary language used. This is not only true of technical terms, but of language which, at least on its face, has no peculiar or technical meaning or significance.

Therefore, evidence of usage may be admissible to give meaning to apparently unambiguous terms of a contract where other parol evidence would be inadmissible. Thus, circumstances known to the parties at the time they entered into contract, such as what that industry considered to be the norm, or reasonable or prudent, should be considered in construing a contract, while the parties' statements of what they intended the contract to mean are not admissible.

It is currently the widely-accepted rule that custom and usage may be proved to show the intention of parties to a written contract or other instrument in the use of phrases of a peculiar technical meaning which, when unexplained, are susceptible of two or more plain and reasonable constructions. Parol evidence may be admitted to establish a technical meaning where certain provincialisms and technicalities of science and commerce have acquired a known, fixed and definite meaning different from their ordinary meaning by legal custom or usage. Thus, in the interpretation of technical terms used in a contract, it is proper to consider the meaning given to those terms in the course of prior dealings between the parties, as well as by business or trade custom or usage....

* * * *

[T]he correct rule with reference to the admissibility of evidence as to trade usage under the circumstances presented here is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are considered to have used them according to their different and peculiar sense as shown by such trade usage. Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, since, by reason of the usage, the words are used by the parties in a *different* sense."

*Hickman*, ¶¶ 12–13, 71 P.3d at 260–61, quoting 12 Samuel Williston, *A Treatise on the Law of Contracts*, § 34:5 (4th ed.1999). *See also Caballo Coal Company*, ¶¶ 11–12, 84 P.3d at 316–17. Thus, we continue to recognize the importance of allowing the use of extrinsic evidence to interpret a contract, including custom and usage in a particular place or trade at the time of execution of the contract, in order to arrive at the plain meaning of the agreement, with the goal of more closely effectuating the parties' true intent.

[¶ 27] If we were to accept Pennaco's invitation to adopt a definition of the term "oil rights" to be applied in every legal document coming before Wyoming courts, there might be greater predictability in resolving disputes over the meaning of that certain term.[5] It would not, however, serve to effectuate the intent of the parties to documents and would undermine this Court's deed interpretation jurisprudence which has developed over more than one hundred years. Upon review of our numerous cases involving interpretation of real property interests, we certainly cannot say that such jurisprudence has caused excessive litigation or confusion as predicted by Pennaco.

[¶ 28] In *Newman*, we surveyed the ways other jurisdictions addressed the problems associated with determining coalbed methane

---

**5.** For a discussion of different approaches to defining ownership rights in real property see David E. Pierce, *Evaluating the Jurisprudential Bases for Ascertaining or Defining Coalbed Methane Ownership*, 4 Wyo. L.Rev. 607 (2004).

ownership. *Newman*, ¶¶ 20–27, 53 P.3d at 546–49. We discussed the advantages and disadvantages of various interpretation models and, ultimately, rejected any rigid rule of law established by the courts without regard to the parties' intent. Instead we returned to our longstanding procedure designed to give "effect to the general intent of the parties to the conveyance with regard to the exploitation of mineral resources." *Newman*, ¶ 27, 53 P.3d at 549. We were not convinced there is any better way to resolve disputes over property ownership than by trying to ascertain the intentions of the parties to the conveyance by looking to "the facts and circumstances surrounding the execution" of deeds. We continue to believe that is the best approach and, therefore, decline Pennaco's invitation to revise the law of deed interpretation in Wyoming.

### Declaration of Interest

[¶ 29] In an attempt to cure the problem with the "oil rights" language in the Rothwell/Parnell deed, Mullinnix arranged for the Parnells to sign a "Declaration of Interest." The declaration stated, in relevant part:

> COMES NOW Mary E. Parnell, a widow, and Reginald Parnell and Mildred Parnell, husband and wife, all of Campbell County, Wyoming for and in consideration of the sum of TEN DOLLARS ($10.00) and other good and valuable consideration and for the further consideration of clarifying the Records of Campbell County, Wyoming do hereby state and declare that they own the following interest in and to all of the oil, gas and associated hydrocarbons, [other minerals deleted] in and under those lands and interests more particularly described as follows: An undivided one-half interest in [legal description omitted] [and an] undivided one-fourth interest in [legal description omitted].

The declaration was signed by the Parnells on August 20, 1968, and recorded in the Campbell County Clerk's Office on August 27, 1968.

[¶ 30] The district court ruled on the effectiveness of the Declaration of Interest as follows:

* * * *

6. The Declaration of Interest dated August 20, 1968[,] did not convey property, and did not alter the then-existing ownership of the mineral estate in the lands described therein.

7. Neither the Plaintiff nor his predecessor relied upon the Declaration of Interest in obtaining the August 1968 mineral deed.

8. Plaintiff's claims of estoppel and waiver are not supported by the evidence offered at trial and considered by this Court.

[¶ 31] On appeal, Mullinnix argues that the district court erred by refusing to recognize the Declaration of Interest as defining the Rothwells' and Parnells' ownership in the subject property. We agree with the district court's conclusion that, pursuant to its plain language, the Declaration of Interest did not affect the parties' interests in the mineral estate. It was signed only by the Parnells, who were the grantees in the original deed, so it could not modify the interests transferred and/or reserved in the original deed. Furthermore, the Declaration of Interest did not contain words of conveyance indicating the Parnells were relinquishing or conveying any interest they held to the Rothwells or Mullinnix. Although no particular words are required to convey real property, the language of the document must indicate a specific intention to convey the property. *See DeWitt v. Balben*, 718 P.2d 854, 860 (Wyo.1986). There were no such words of conveyance included in the Declaration of Interest. Consequently, the declaration failed to modify legal title to the property.

[¶ 32] Mullinnix also argues, under the doctrines of equitable estoppel, laches, and/or waiver, the Declaration of Interest, prohibits the Parnells from claiming they owned the entire gas estate. The doctrines of estoppel, laches, and waiver are related doctrines originating in the principles of equity.

> "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded from asserting rights which might otherwise have existed as

against another person who has in good faith relied upon such conduct and has been led thereby to change his position for the worse. Equitable estoppel arises only when a party, by acts, conduct, or acquiescence causes another to change his position. The elements of equitable estoppel are a lack of knowledge, reliance in good faith, and action or inaction that results in an injury."

*Parkhurst v. Boykin*, 2004 WY 90, ¶ 21, 94 P.3d 450, 460 (Wyo.2004) (citations omitted). Laches is a form of equitable estoppel which operates when a party has unreasonably delayed in asserting a legal right. *Cathcart v. Meyer*, 2004 WY 49, ¶ 13, 88 P.3d 1050, 1058 (Wyo.2004). "Laches does not depend on the passage of time alone; the plaintiff must be chargeable with lack of diligence in failing to proceed more promptly. Laches will apply when the delay has worked injustice, prejudice, or disadvantage to the defendant." *Id.* (citations omitted). Similarly, "[t]he traditional elements of waiver are: '(1) an existing right; (2) knowledge of that right; and (3) an intent to relinquish it.'" *Scherer v. Schuler Custom Homes Const., Inc.*, 2004 WY 109, ¶ 16, 98 P.3d 159, 162 (Wyo.2004), quoting *Jackson State Bank v. Homar*, 837 P.2d 1081, 1086 (Wyo.1992).

[¶ 33] Mullinnix asserts it acted to its detriment by allowing payment of the $24,000 draft to the Rothwells for the mineral deed based upon the Parnells' promise to sign the declaration of interest. There are two problems with Mullinnix's argument: the language of the declaration does not support Mullinnix's claim that the Parnells relinquished or waived their interest in the gas by signing it and the record indicates Mullinnix did not rely upon the Parnells' execution of the declaration when it purchased the Rothwells' mineral interest. The plain language of the Declaration of Interest simply states the Parnells owned one-half or one-fourth, respectively, of the oil and gas in the subject property. The declaration does not, however, include any language of exclusivity to indicate that the Parnells *only* owned the stated interests in the gas. In addition, the Parnells did not stipulate to the Rothwells' or Mullinnix's ownership of an interest in the gas—which is the interest at issue in this case. As recognized by the parties at the trial, the problem could have been cured with a cross-conveyance between both parties to the original deed. Unfortunately for Mullinnix, the Declaration of Interest did not go far enough to effectuate the result it apparently desired—a recognition by the Parnells that the Rothwells or Mullinnix owned a portion of the gas interests. Consequently, there was no basis in equity to prevent the Parnells from asserting they owned the disputed gas estate.

[¶ 34] Furthermore, the time of filing the relevant documents indicates Mullinnix did not rely upon the declaration in paying the draft. The Rothwells signed the mineral deed to Mullinnix on August 6, 1968, and deposited the $24,000 draft on August 7, 1968. The draft was paid according to its terms in ten days, and the mineral deed was recorded on August 15, 1968. The Parnells did not sign the Declaration of Interest until August 20, 1968, and it was not recorded until a week later, on August 27, 1968. Therefore, the documentary evidence indicates Mullinnix did not rely upon the Declaration of Interest when it purchased the Rothwells' mineral interests. Mr. Mullinnix testified, however, that, prior to the due date of the draft, the Parnells orally represented they would sign the Declaration of Interest. Mr. Mullinnix claimed he relied upon the Parnells' representation when he allowed the draft to be paid and recorded the mineral deed. His claim is refuted by his own business memorandum dated August 12, 1968, in which he discussed the title problem and his thoughts about how to cure it. He stated: "The oil is the greatest potential value for the properties involved, and we feel no particular concern for our position as to oil. Therefore, we are apt to pay the outstanding draft, irrespective of what curative work can be accomplished prior to due-date of the draft." On this record, we conclude the district court properly ruled the Declaration of Interest did not preclude the Parnells from challenging Mullinnix's claim to the gas estate.

[¶ 35] Affirmed.