2011 WY 50

**ORTHOPAEDICS OF JACKSON HOLE, P.C., d/b/a Teton Orthopaedics,**
Appellant (Defendant),

v.

**Michael J. FORD, M.D.,**
Appellee (Plaintiff).

No. S–09–0136.

Supreme Court of Wyoming.

March 21, 2011.

Representing Appellant: Gary R. Scott of Hirst Applegate, LLP, Cheyenne, Wyoming.

Representing Appellee: Paul J. Hickey and O'Kelley H. Pearson of Hickey & Evans, LLP, Cheyenne, Wyoming; and Joel M. Vincent of Vincent & Vincent, Riverton, Wyoming. Argument by Mr. Vincent.

Before KITE, C.J., and GOLDEN, HILL, VOIGT,* and BURKE, JJ.

GOLDEN, Justice.

[¶ 1]   Orthopaedics of Jackson Hole, P.C., (hereinafter referred to as OJH) is a professional organization founded by five orthopedic surgeons in 1998.   Michael Ford is an orthopedic surgeon who joined OJH in 2000, at which time he received one share of stock in OJH.   In 2005, Dr. Ford left OJH.   The parties could not agree on the value of the one share of stock, prompting Dr. Ford to commence the instant legal action.

[¶ 2]   Dr. Ford brought a petition for a declaratory judgment as to the value of the stock as well as other causes of action.   OJH counterclaimed that Dr. Ford, in leaving OJH at the time he did, breached his fiduciary duty to the organization.   OJH also brought a promissory estoppel counterclaim against Dr. Ford, asserting it incurred extra costs based on an alleged promise by Dr. Ford, made in 2004, to continue working for OJH for five to ten years.

[¶ 3]   After a bench trial, the district court accepted the valuation of the stock as presented by Dr. Ford.   The district court also denied all OJH's counterclaims.   We reverse the district court's decision as to the valuation of the stock and remand for further proceedings on the issue.   We affirm the district court's denial of the counterclaims brought by OJH.

### ISSUES

[¶ 4]   OJH presents multiple issues:

1.   Did the trial court err when it found that [Ford] signed a 1998 OJH shareholder's agreement, and thus that it was that agreement that was the relevant agreement for purposes of valuing [Ford's] one share of OJH stock?

2.   Did the trial court err when it then reformed the 1998 shareholder's agreement and failed to apply the valuation formula contained in that agreement?

3.   Did the trial court err when it failed to apply the valuation formula agreed to by [Ford] in a shareholders' meeting in August 2003?

4.   Did the trial court err when it denied [OJH's] Motion in Limine, and allowed [Ford] on the eve of trial to change the

* *Chief Justice at time of oral argument*

theory of his case as to the relevant valuation formula?

5. Did the trial court err when it found that [OJH] failed to prove by a preponderance of the evidence its counterclaims for promissory estoppel and breach of fiduciary duty?

## FACTS

[¶ 5] OJH was formed in 1998 by a group of five orthopedic surgeons. They were each issued one share of stock. The OJH Shareholder's Agreement (1998 Agreement) stated that the stock was not intended as an investment but rather was issued as evidence of ownership in OJH and consequent governing rights and obligations. In the event one of the shareholders wanted to sell his/her share, and in the absence of an agreement as to the value of the company, the value of the company would be determined by OJH's certified public accountant according to generally accepted accounting principles (GAAP). The agreement provided that all future shares that might be issued would be subject to the agreement. The agreement also provided it could only be amended by unanimous vote of all shareholders.

[¶ 6] Shortly after OJH was established, OJH signed two contracts with a medical office management company, Ortholink Physicians Corporation (Ortholink). One contract was an Asset Purchase Agreement, whereby Ortholink purchased all assets of OJH except the accounts receivable (AR). The other contract was a Service Agreement. Under the Service Agreement Ortholink essentially took over the business aspects of OJH, for instance assuming OJH building leases and providing OJH with equipment, supplies, support personnel, management and financial advisory services. The Service Agreement also provided for Ortholink to monthly purchase OJH's AR for an amount it determined based on OJH billing and historical collection rates. Ortholink reduced the amount by its expenses on behalf of OJH and a fifteen percent service fee, then paid the remaining to OJH. Ortholink was to maintain all financial records in accordance with GAAP.

[¶ 7] In 2001, the Service Agreement between OJH and Ortholink was amended to essentially return the day-to-day responsibilities of office management from Ortholink back to OJH. In return, the service fee charged by Ortholink was reduced. In 2003, the Service Agreement was again amended. The Second Amended Service Agreement provided that Ortholink would no longer handle OJH's AR. OJH would repurchase its AR already purchased by Ortholink and the administration of all future AR would be OJH's responsibility. It also provided that OJH would pay Ortholink a certain monthly amount for its use of capital assets owned by Ortholink. As each capital asset used by OJH was depreciated off Ortholink's books, Ortholink would issue a bill of sale to OJH for the item for no further consideration. In general, OJH would be responsible for purchasing all future capital assets for use in its practice. For its part, Ortholink agreed to continue to provide limited financial services at an again reduced service fee.

[¶ 8] In order to repurchase its AR from Ortholink, OJH borrowed approximately $1.13 million. This and the fact that OJH would now be purchasing its own capital assets precipitated revisiting the terms of the Shareholders Agreement. At a shareholders meeting in August 2003, the shareholders, by a vote of eight to one, approved a change to the language of the OJH Shareholders Agreement relating to the valuation of shares. The new language, as reported in the minutes, read:

> For a Shareholder redemption in the event of death or termination, Shareholder's individual AR continues to pay the Shareholder less a 10% collection fee and any of the collection rate less any liability associated with acquiring the shareholder's AR from Ortholink in the 2003 restructuring.

> Fixed assets less liabilities for fixed assets divided by the number of Shareholders will be the calculation for the balance of the valuation.

> Further, the language addressing the value of patient records is to be deleted.

(Hereinafter referred to as the 2003 Formula.)

[¶ 9] OJH did not formally execute a new Shareholders Agreement until March 2005. At that time a document entitled "Amended and Restated Shareholders Agreement" was created and signed by all but one shareholder (hereinafter referred to as the 2005 Agreement). The valuation formula contained in the 2005 Agreement stated:

> The Corporation's value as of the Valuation Date shall be equal to the Corporation's fixed assets less its liabilities for fixed assets divided by the number of shareholders, based upon the Corporation's most recent regularly prepared balance sheet. The value of the Corporation as so determined shall then be divided by the number of shares of stock of the Corporation issued and outstanding and multiplied by the number of shares being transferred. The result shall be the purchase price for the offered shares....

It is agreed that the lack of language referring to AR is a mistake. Rather, the valuation language of the 2005 Agreement was intended to correspond to the 2003 Formula.

[¶ 10] Dr. Ford is an orthopedic surgeon who had practiced in Riverton for approximately 26 years. In 1998, Dr. Ford began attempts to build an outpatient surgical center, displeasing Riverton Memorial Hospital. In response, the hospital actively recruited other orthopedic surgeons to open practices in Riverton, in direct competition with Dr. Ford. Among those contacted by the hospital was OJH. OJH was interested in expanding its territory and referral base into Fremont County. It felt it was in its best interest, however, to work with Dr. Ford, with his established client base, instead of against him.

[¶ 11] To this end, negotiations began between Dr. Peter Rork, shareholder and then president of OJH, and Dr. Ford regarding the possibility of Dr. Ford joining OJH. As part of the negotiations, Dr. Rork advised Dr. Ford that OJH would help recruit a second orthopedic surgeon to the Riverton office so Dr. Ford would not have to run a solo practice and also that some of the OJH subspecialists would establish limited clinic time at the Riverton office. Of critical importance to Dr. Ford, Dr. Rork offered him an opportunity to become affiliated with Teton Outpatient Services ("TOPS"), an established outpatient surgery center in Jackson. Dr. Ford insisted he be allowed to purchase an interest in TOPS as a prerequisite to joining OJH.

[¶ 12] As a result of the negotiations, Dr. Ford was allowed to buy an interest in TOPS and subsequently, effective January 1, 2000, Dr. Ford joined OJH. Upon joining, Dr. Ford was issued one share of OJH stock. He was given a packet of papers which contained the 1998 Agreement. As it had with the other members of OJH, Ortholink purchased from Dr. Ford all assets related to Dr. Ford's practice. Ortholink paid Dr. Ford in cash and Ortholink stock. As part of receiving the stock, Dr. Ford signed a shareholder agreement with Ortholink. Dr. Ford sold his Ortholink shares back to Ortholink shortly thereafter.

[¶ 13] As part of OJH's strategic plan to establish a presence in Fremont County, it employed another orthopedist, Dr. John Harp, to practice with Dr. Ford in Riverton and established a satellite office in Lander. Subspecialists from OJH in Jackson would occasionally hold clinic hours in Riverton.

[¶ 14] At the time he joined OJH, Dr. Ford's office was in a building commonly referred to as the 12th Street Medical Building. New owners bought the building in 2000 and OJH entered into a five year lease with them. Although Dr. Ford had maintained an office in the building for many years, the situation had become less than ideal. Originally, the building was situated next to the county hospital but the hospital had abandoned that building. The neighborhood had changed, and the 12th Street Medical Building was no longer in a high visibility area. In addition to these drawbacks, the new owners were not properly maintaining the building.

[¶ 15] In the spring of 2003, Dr. Ford learned that the building owners were attempting to sell the building. The OJH lease provided that a new owner could cancel the lease with six months notice. Dr. Ford also learned that another tenant with which his practice had ties, Fremont Therapy Group, a

group of physical therapists, was not renewing its lease.

[¶ 16] Around the same time, Dr. Ford was approached by a construction and building management company known as P & K Development. P & K was in the process of designing a new medical office building near Riverton Memorial Hospital and suggested that it could add space to the design to suit OJH in exchange for a long term lease. As of May 2003, protracted negotiations began between P & K and OJH. OJH was primarily represented in the discussions by the Riverton office manager, Connie Nyberg, and OJH's administrator, Brian Smith. After much internal informal discussion, in November 2003 a formal proposal for a ten year lease with P & K, prepared by Nyberg and Smith, was presented by Dr. Ford and Dr. Harp to the OJH shareholders, complete with square footage and cost numbers. At the meeting the shareholders determined: "Next critical step is to cost out build-to-suit as comparison to P & K proposal." At the December shareholders meeting, a proposal for a fifteen year lease was presented. The price per square foot was reduced to reflect the longer lease.

[¶ 17] The shareholders of OJH determined they did not want to move forward with the project unless the accounting was changed to make the Fremont County offices responsible for certain individual Fremont County costs, including lease payments. Cost projections were prepared by Nyberg and Smith and shown to Dr. Ford. Dr. Ford was willing to accept the accounting change based on those cost projections. At a shareholders meeting in April 2004, a corresponding change in accounting was adopted. It stated in the minutes that the accounting change was made in order to approve and execute a lease for the new Riverton building.

[¶ 18] Also discussed in the context of the new lease was the amount of time Dr. Ford planned to continue to practice. Dr. Ford indicated to the shareholders he anticipated practicing at least five years, maybe ten if the conditions were right. No indication of this discussion occurs in any shareholders meeting minutes. The lease was eventually signed in May 2004. With the lease in place, construction began and Dr. Ford moved into the new office space in the beginning of July 2005.

[¶ 19] Over the course of time, Dr. Ford became increasingly unhappy with the management of OJH. Dr. Harp was asked by OJH to spend more time at the Lander clinic, leaving Dr. Ford to cover the expenses of the new Riverton office. In May 2005, Dr. Ford was told he would have to sell his interest in TOPS. Dr. Ford resisted this because he still considered participation in TOPS a critically important benefit of membership in OJH. Finally, in September 2005, citing personal reasons, Dr. Ford submitted a letter of resignation as a shareholder, effective December 31, 2005. Dr. Ford proposed that he continue with OJH as an employee, at a guaranteed salary. In the alternative, Dr. Ford offered to stay on until a replacement doctor could be hired. The parties were unable to reach agreement on employment terms. OJH also was not interested in Dr. Ford's offer to stay until it could recruit another doctor. Consequently, Dr. Ford severed professional ties with OJH on December 31, 2005.

[¶ 20] Dr. Ford and OJH were unable to agree on the value of Dr. Ford's one share of OJH stock, resulting in the current litigation. When Dr. Ford filed for a declaratory judgment against OJH for the valuation of the stock, his petition stated the share should be valued either by the 2003 Formula or the 2005 Agreement. OJH answered that, in light of the mistaken language in the 2005 Agreement, the share should be valued according the 2003 Formula. Throughout pretrial procedures both parties relied exclusively on the 2003 Formula.

[¶ 21] In response to Dr. Ford's complaint, OJH counterclaimed for breach of fiduciary duty and promissory estoppel, both based on Dr. Ford's resignation. It claimed Dr. Ford was liable under both theories to OJH because he resigned after OJH had signed the fifteen year lease on the new Riverton location based on his assurances that he would continue to practice for OJH in Riverton for five to ten years. OJH claimed it suffered damages when it was forced to

abandon the space and could not fully sublease it.

[¶ 22] A bench trial was held after which the district court entered a judgment including findings of fact and conclusions of law. The language of the judgment was virtually identical to the language of the proposed findings of fact and conclusions of law submitted by Dr. Ford's counsel. The district court accepted Dr. Ford's stock valuation calculations and rejected OJH's counterclaims.

## DISCUSSION

[¶ 23] The issues overlap. We therefore will depart from the issues as framed by Dr. Ford and treat the issues by general category.

### *1998 OJH Shareholders Agreement*

[¶ 24] Much confusion was generated by Dr. Ford's counsel when, a few days before trial, he contacted OJH's counsel and stated he would proceed using a valuation formula different from the 2003 Formula that had been agreed to by the parties. OJH's counsel understood Dr. Ford's counsel to be indicating he would use the language in the original 1998 Agreement as his new valuation basis. Consequently, OJH's counsel filed a motion in limine to exclude all references to the 1998 Agreement, arguing it was tantamount to amending the complaint. During the course of argument on the motion, Dr. Ford's counsel expressly disavowed the application of the 1998 Agreement and clarified that he was actually intending to refer to language of the 2000 shareholder agreement between Ortholink and Dr. Ford. The district court denied the motion in limine subject to reconsideration as the trial progressed.

[¶ 25] The only trial testimony that referred to the original 1998 Agreement came from Dr. Ford. Dr. Ford testified that, based on his discussions with counsel, he was unsure of whether the valuation of his one share of OJH stock should be based on the original 1998 Agreement or the 2003 Formula. The matter was conclusively resolved, however, when Dr. Ford's expert who testified as to the value of the stock expressly confirmed his calculations were based on the 2003 Formula.

[¶ 26] This matter arises on appeal because the Judgment, as composed by Dr. Ford's counsel and adopted by the district court, includes a conclusion of law that the original 1998 Agreement was the applicable agreement. It reasoned that neither the 2003 Formula nor the 2005 Agreement applied because they were not unanimously adopted, as required by the terms of the original 1998 Agreement.

[¶ 27] As always, we review conclusions of law de novo. *Helm v. Clark*, 2010 WY 168, ¶ 6, 244 P.3d 1052, 1056 (Wyo.2010); *Bellis v. Kersey*, 2010 WY 138, ¶ 10, 241 P.3d 818, 822 (Wyo.2010). Although legally technically correct, the conclusion is improper because it goes beyond the issues presented by the parties.[1] Triable issues are governed by the pleadings or a pretrial order. The parties, in their pleadings and all pretrial proceedings, agreed the language of the 2003 Formula would govern the valuation in the context of this litigation. There was no attempt to amend the pleadings. No evidence of the value of the stock under the 1998 Agreement was presented either pretrial or during trial. At trial, the experts for both sides based their respective valuations on the 2003 Formula. Under the circumstances, the ruling of the district court that 1998 Agreement applied was error.

[¶ 28] Dr. Ford seemingly agrees with this conclusion. On appeal, Dr. Ford argues that, even though the 1998 Agreement was never properly amended, the issue of the applicability of the 1998 Agreement is irrelevant. He concurs that the parties agreed the 2003 Formula was the applicable valuation formula. He confirms that his expert used

---

1. OJH argues on appeal that, since Dr. Ford never signed the 1998 OJH shareholders agreement it does not apply to him. The language of the agreement, however, shows that it automatically applies to all shares of stock to be issued in the future. Dr. Ford was given a copy of the agreement when he joined OJH. If it did not apply, the one share of stock issued to Dr. Ford was truly worthless. The argument is also inconsistent with the OJH's emphasis on the language in the 1998 Agreement that the stock was not intended as an investment.

the 2003 Formula as the basis for his calculations. Then he completely bypasses the district court's finding that the 1998 Agreement contained the applicable language and instead rationalizes that the district court adopted the 2003 Formula as the basis for valuation when it adopted his valuation.

[¶ 29] Unfortunately, Dr. Ford is incorrect about how the district court proceeded. By determining the 1998 Agreement was the applicable agreement, the district court implicitly rejected the methodology used by the experts to determine a value for the stock. Instead, focusing on the language of the 1998 Agreement, the district court determined "no evidence was adduced" that a forensic expert would be able to ascertain a value for the stock using the 1998 Agreement valuation language. The resultant action taken by the district court was to resort to equity to award Dr. Ford the amount presented by Dr. Ford's expert witness. Thus, far from being an irrelevant finding by the district court, the finding that the 1998 Agreement contains the applicable valuation formula is the basis for the district court's ultimate decision regarding the value of the stock. Because of this, we must reverse the district court's decision.

[¶ 30] As a general rule, this Court would return the case to the district court for further consideration on the issue of valuation. Under the precise circumstances of this case, however, we find the legal and factual evidence in the record is sufficient for us to determine the proper value of the stock.

*Stock Valuation*

[¶ 31] This Court typically reviews a district court's findings of fact after a bench trial to determine if they are clearly erroneous. The factual findings of a trial judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence. A finding is clearly erroneous when, although there is evidence to support

it, this Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Helm*, ¶ 6, 244 P.3d at 1056; *Hofstad v. Christie*, 2010 WY 134, ¶ 7, 240 P.3d 816, 818 (Wyo.2010); *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006).

[¶ 32] The Judgment in this case, however, is not typical. As already noted, the Judgment entered by the district court is in effect identical to the proposed findings of fact and conclusions of law presented to the district court by Dr. Ford. Not even typographical errors were corrected. More egregiously, substantive errors also exist. For instance, the Judgment refers to exhibits that were never admitted and incorrect transcript cites.

[¶ 33] Although proposed findings of fact and conclusions of law submitted by the parties are helpful to a court, the court must exercise its independent analysis in reaching the final judgment. This does not mean that it is per se improper for a court to adopt, *in toto*, the proposed findings and conclusions of a party, but a judgment should reflect the studied decision of the court. This Court has stated:

> Speaking first to the degree of inquiry called for in this case, we note that findings and conclusions prepared by counsel and adopted, more or less verbatim, by the trial court may be less helpful on review than findings and conclusions drawn by a disinterested person. See, *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.*, 10 Cir., 497 F.2d 285, 287 (1974). Nevertheless, findings rendered under such circumstances will stand if supported by the evidence. *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). In appropriate cases, the circumstances may lead to a more searching inquiry for error, *In re Las Colinas, Inc.*, 1 Cir., 426 F.2d 1005, 1010 (1970)[.]

*First Nat'l Bank of Lander v. First Wyo. Sav. & Loan Ass'n*, 592 P.2d 697, 702–03 (Wyo.1979). In *First National Bank*, the Court found that a more searching inquiry was not necessary because the record re-

flected that the trial court gave the parties a great deal of preliminary guidance in drafting the proposed findings and conclusions. Unfortunately, the record before us contains no such indicia of involvement by the district court. Under the circumstances, we lack confidence that the judgment adequately reflects thorough consideration by the district court. As such, we will review the evidence behind the findings of fact more thoroughly than is customary.

[¶ 34] Under the 2003 Formula, there are two components to valuing OJH stock. The first component is accounts receivable. The second is fixed assets. As a reminder, the 2003 Formula states:

> For a Shareholder redemption in the event of death or termination, Shareholder's individual AR continues to pay the Shareholder less a 10% collection fee and any of the collection rate less any liability associated with acquiring the shareholder's AR from Ortholink in the 2003 restructuring.

> Fixed assets less liabilities for fixed assets divided by the number of Shareholders will be the calculation for the balance of the valuation.

> Further, the language addressing the value of patient records is to be deleted.

[¶ 35] We turn our attention first to fixed assets because this is the biggest point of contention between the parties. OJH claims that, as of December 31, 2005, the net value of any fixed assets it owned was zero. Dr. Ford, on the other hand, calculates several hundred thousand dollars worth of fixed assets. Part of the discrepancy arises because the parties do not agree on the definition of "fixed assets." OJH's expert defined "fixed assets" essentially as tangible items that could be depreciated, such as equipment, chairs, tables, computer systems, etc. Dr. Ford's expert gave it a much broader meaning. He testified the term "fixed assets" was an acronym for "total assets."

[¶ 36] The resolution of the issue of the definition of "fixed assets" requires us to construe the language of the 2003 Formula. Construction of the language of a written agreement being an issue of law, we engage in our review of the language of the 2003 Formula de novo. Our goal is to discern, and give effect to, the intent of the contracting shareholders. In order to determine the intent, we look first to the plain language of the contract. *Terris v. Kimmel*, 2010 WY 110, ¶ 7, 236 P.3d 1022, 1025 (Wyo.2010); *Double Eagle Petroleum & Mining Corp. v. Questar Exploration & Production Co.*, 2003 WY 139, ¶¶ 7–8, 78 P.3d 679, 681–82 (Wyo. 2003).

[¶ 37] The term "fixed asset" has a generally accepted definition. The following definitions for a "fixed asset" are representative: "An asset not readily convertible to cash that is used in the normal course of business. Examples of fixed assets include machinery, buildings, and fixtures." David L. Scott, *Wall Street Words: An A to Z Guide to Investment Terms for Today's Investor* (Houghton Mifflin Harcourt Publishing Co. 2010), found at http://invest. yourdictionary.com/fixed-asset; "[a] long-term tangible piece of property that a firm owns and uses in the production of its income and is not expected to be consumed or converted into cash any sooner than at least one year's time. Fixed assets are sometimes collectively referred to as 'plant'." http://www. investopedia.com/terms/f/fixedasset.asp; "capital asset [also termed fixed asset]: a long-term asset used in the operation of a business or used to produce goods or services, such as equipment, land, or an industrial plant." Black's Law Dictionary 134 (9th ed. 2009).

[¶ 38] Along with this generally accepted definition, we can also look to the circumstances surrounding the execution of the document in determining if there is any ambiguity in the language. *Davidson Land Co., LLC v. Davidson*, 2011 WY 29, ¶ 14, 247 P.3d 67, 72 (Wyo.2011); *Ecosystem Res., L.C. v. Broadbent Land & Res., L.L.C.*, 2007 WY 87, ¶ 10, 158 P.3d 685, 688 (Wyo.2007). In the instant case, the 2003 Formula was instigated by the Second Amended Service Agreement with Ortholink that provided that Ortholink was no longer obligated to provide OJH with capital assets. Thus, in the future, OJH would be acquiring fixed assets in its own name. The shareholders of OJH wanted the stock valuation to reflect the value of

those fixed assets. Given the language and the circumstances, we find the intent of the shareholders is clear. The term "fixed assets" was used by the shareholders in the 2003 Formula in its generally accepted definition as identified above.

▪ [¶ 39] Dr. Ford itemized categories of assets he included in his calculation, making it simple to apply this definition. Among the assets he listed cash in hand and the Ortholink Service Agreement. These two assets plainly do not fit the definition of a fixed asset as used in the 2003 Formula. They therefore must be removed from the calculation.

▪ [¶ 40] The other major point of contention in determining the value of fixed assets concerns the capital assets owned by Ortholink and used by OJH in its practice. Pursuant to the Second Amended Service Agreement, OJH pays Ortholink a fee for the use of the assets. The fee is set according to Ortholink's depreciation schedule. After Ortholink fully depreciates a capital asset, it transfers ownership of that asset to OJH by means of a bill of sale for no further consideration.

[¶ 41] OJH looks solely to title to determine the ownership of the capital assets. Ortholink has title until such time as Ortholink issues a bill of sale to OJH. Title is then transferred, but the purchase price is zero. Dr. Ford, on the other hand, claims this procedure in reality is a lease-to-own arrangement. Thus, Dr. Ford argues the value of the capital assets being used by OJH should be credited to OJH's books, with Ortholink having a security interest in the assets until full payment is received.

[¶ 42] We need not delve into the merits of Dr. Ford's contention because even if he is correct, there is a basic failure of proof. The 2003 Formula calls for fixed assets minus liabilities for fixed assets. The only evidence presented by Dr. Ford was what he contended was the actual amount paid by OJH to Ortholink for the use of certain capital assets since 2003 when the second amendment was signed. He presented no evidence as to the actual value of the capital assets as of December 31, 2005. No consideration was given to the fact that, if an item had been paid off, then it had probably been in use for many years and thus of considerably less value than what OJH had paid over time. Also not taken into consideration is the fact that, if OJH was still paying for the use of an item, then under Dr. Ford's lease theory there was a corresponding liability. This failure of proof requires we remove this category of assets from Dr. Ford's calculation.

▪ [¶ 43] There is one fixed asset both parties agree on. OJH bought a computer hardware and software system in its own name. This computer system does constitute a fixed asset and is properly included. Dr. Ford has it listed for the purchase price minus depreciation. The evidence, however, discloses OJH borrowed the money to purchase the system and there is still outstanding debt. Dr. Ford failed to present any evidence regarding the amount of this debt or apply such debt to the value of the computer system to determine if any equity remained in the computer system. This failure of proof requires this asset be removed from Dr. Ford's calculation.

[¶ 44] Dr. Ford listed no further categories of fixed assets. Given our determination that all the assets presented by Dr. Ford either did not meet the definition of a fixed asset or were not properly proven, Dr. Ford is left with no evidence that OJH had fixed assets that exceeded liabilities. Thus he is entitled to no recovery under the fixed assets portion of the 2003 Formula.

▪ [¶ 45] Turning to the AR component of the 2003 Formula, the parties actually are in fairly close agreement as to the amount owed. At trial, Dr. Ford was shown the calculations of this component prepared by OJH. OJH had calculated his AR at $183,543. Dr. Ford accepted the number as accurate. OJH then subtracted the ten percent collection fee to arrive at the net AR. From the net AR, OJH subtracted Dr. Ford's share of the liability associated with acquiring the shareholder's AR from Ortholink in the 2003 restructuring. OJH came up with what it termed "equity value" of $67,656. Dr. Ford agreed with the calculations to this point. From that number OJH

deducted $4,749 for accumulated payroll deficit, leaving a net due to Dr. Ford of $62,907. Dr. Ford disagreed with this deduction. We agree with Dr. Ford that the accumulated payroll deficit should not be deducted from the amount owed. The 2003 Formula speaks of AR minus certain specifically delineated liabilities. The calculation of the value of Dr. Ford's share of stock ends at that point. We find the amount owed to Dr. Ford, as accepted by him at trial, is $67,656.

## COUNTERCLAIMS

### Promissory Estoppel

[¶ 46] Promissory estoppel exists in cases where an unambiguous promise is made in circumstances calculated to induce reliance, and does induce reliance to the detriment of the promisee. *B & W Glass v. Weather Shield Mfg.,* 829 P.2d 809, 813 (Wyo. 1992); *Goldstick v. ICM Realty,* 788 F.2d 456, 462 (7th Cir.1986). Broken down, the elements of a promissory estoppel claim are: (1) the existence of a clear and definite promise which the promisor should reasonably expect to induce action by the promisee; (2) proof that the promisee acted to its detriment in reasonable reliance on the promise; and (3) a finding that injustice can be avoided only if the court enforces the promise. *Harper v. Fidelity & Guar. Life Ins. Co.,* 2010 WY 89, ¶ 26, 234 P.3d 1211, 1220 (Wyo.2010); *Parkhurst v. Boykin,* 2004 WY 90, ¶ 21, 94 P.3d 450, 460 (Wyo.2004); *City of Powell v. Busboom,* 2002 WY 58, ¶ 8, 44 P.3d 63, 66 (Wyo.2002). The party asserting promissory estoppel is assigned the burden of establishing all of the elements of the doctrine with a standard of strict proof. *B & W Glass,* 829 P.2d at 819.

[¶ 47] OJH alleges it only entered into the fifteen year lease in the new Riverton building because Dr. Ford promised he would work for OJH in Riverton for another five to ten years. After he resigned, OJH was left with leased office space it was unable to find new tenants for, thus suffering damages.

[¶ 48] As an initial consideration, we consider it doubtful that Dr. Ford's statement was a "clear and definite" promise to continue working for OJH in Riverton for five to ten years. Further, whatever the exact words were, the statement was not made in a vacuum. Dr. Ford made the statement in light of his current working conditions and his current health status. The fact that either one of these could change at any time makes it unreasonable for anyone to rely on such statement as a basis to enter into a fifteen year lease. It also seems unreasonable to enter into a fifteen year lease on office space designed for two doctors and visiting subspecialists based on the alleged promise of one doctor to practice another five to ten years.

[¶ 49] Ultimately, however, the claim fails for a much more fundamental reason. OJH failed to meet its burden of proving, under the strict standard of proof required, that it acted in reliance on Dr. Ford's statement. The decision to enter the lease was a group decision. The decision required assent from a majority of OJH shareholders. As of April 2004, there were ten shareholders. At the shareholders meeting held that month, the shareholders approved the lease, after a change in the accounting to separate certain costs to Fremont County, by a vote of seven in favor, two abstaining, and one absent.

[¶ 50] OJH presented evidence from only two of those shareholders, Dr. Woodfin and Dr. Rork. Dr. Woodfin testified uncategorically that he would not have voted to enter into the lease without the alleged promise from Dr. Ford as to his continued practice. Dr. Rork testified entering into the lease fit within the strategic plan of OJH in Riverton and made sense in light of Dr. Ford's alleged promise. On the other side, Dr. Guier, the only other shareholder to testify, testified he knew Dr. Ford had said he intended to continue another five to ten years, but he did not remember Dr. Ford making any promises.

[¶ 51] Missing is evidence from the other board members as to the effect Dr. Ford's intentions regarding his continuing to practice had on their individual votes. The closest evidence is from Dr. Guier who testified he had no recollection of the concerns of other board members. In short, there is no evidence that OJH, through the actions of its shareholders, entered into the fifteen year

lease because of Dr. Ford's stated intention to continue practicing five to ten years.

### Breach of Fiduciary Duty

[¶ 52] OJH argues Dr. Ford breached his fiduciary duty to OJH by resigning after inducing OJH into entering into a fifteen year lease by promising to practice another five to ten years and accepting the change in accounting structure to make Fremont County a separate cost center. OJH frames the claim in the context of Wyo. Stat. Ann. § 17–16–830(a). Section 17–16–830(a) embodies the principle that corporate officers and directors have a fundamental duty of loyalty and fiduciary responsibility to their corporation. It begins:

**General standards for directors.**

(a) A director shall discharge his duties as a director, including his duties as a member of a committee:

(i) In good faith; and

(ii) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(iii) In a manner he reasonably believes to be in or at least not opposed to the best interests of the corporation.

Wyo. Stat. Ann. § 17–16–830(a) (LexisNexis 2005) (amended 2009).

[¶ 53] We fail to see how this statute applies to the current situation. The statute imposes upon corporate directors the duty to manage the affairs of the corporation in the best interests of the corporation and its shareholders. *See, e.g., Squaw Mountain Cattle Co. v. Bowen*, 804 P.2d 1292, 1297 (Wyo.1991) (director breached fiduciary duty by failing to disclose noteworthy financial information to shareholders); *Lynch v. Patterson*, 701 P.2d 1126, 1131–32 (Wyo.1985) (directors breached fiduciary duty by diverting corporate assets to their benefit); *Voss Oil Company v. Voss*, 367 P.2d 977, 979 (Wyo.1962), (interlocking directors breached fiduciary duty by entering transaction from which they profited to the disadvantage of the corporation). OJH does not allege Dr. Ford acted improperly in the management of the company, in "discharge[ing] his duties as a director." On appeal, OJH simply alleges

that "leaving OJH under the circumstances that he did was not an act of good faith on Ford's part, and was contrary to the interests of OJH and its shareholders."

[¶ 54] The argument presented by OJH on appeal for breach of fiduciary duty is the same argument it presents on its claim for promissory estoppel. The damages claimed are those for expenses incurred in not being able to sublease the Riverton office space. The real issue is not Dr. Ford resigning as a shareholder but rather his resigning as an employee. This has nothing to do with his statutory corporate responsibilities.

[¶ 55] Even so, we find Dr. Ford exercised good faith under the circumstances. He offered to remain as an employee or for as long as OJH needed in order to recruit another doctor. His resignation was prompted in part by personal reasons, but also by conditions of employment. Dr. Harp was working primarily out of Lander, leaving Dr. Ford essentially in a solo practice, and other OJH subspecialists were not willing to come to Riverton. By the time of his resignation, Dr. Ford felt that he was no longer supported by the other OJH shareholders. In a letter addressed to his fellow shareholders, Dr. Ford further explained his position:

It is my preference to work 5–10 years in Fremont County. . . . However the current financial arrangement has changed to a degree that I find no longer acceptable. . . . With the sale of my interest in TOPS the whole financial arrangement has been turned upside down with little upside and a lot of risk to be a partner in a one man office.

I had hoped that after our legal problems of the past years that we could focus on long term planning for Fremont County. I have been on the agenda for three months! With the changes of May, 2005, i.e. TOPS, lack of overhead insurance for the group to cover us in illness or injury and the shortage of physicians to come to Fremont County, the whole image of [OJH] is different than Peter [Rork] and I envisioned in 1999. This lack of presence of our group has not been unnoticed by the Fremont County medical staff, community and [OJH] staff based in Fremont County.

Our competitors certainly have noticed we seem to be a group in name only due to the lack of a visible presence in the past two years. How many of you have presented a CME or traveled to see what has happened down here?

\* \* \* \*

I would find it preferable to continue working with my current partners long term with an equitable salary with bonus for a productive year. A [OJH] presence in Fremont County protects [OJH] flanks and prevents outside groups from stepping into a void but the group obviously no longer supports this strategy.

Under the circumstances, we think Dr. Ford's actions, while not ideal from the standpoint of OJH, did not violate any possible duty of good faith.

[¶ 56] OJH further complains that Dr. Ford's decision to continue his practice in Riverton made it more difficult to recruit a new doctor. However, acting in his capacity as an employee, he complied with a non-compete clause in his employment contract by buying it out, the contractually agreed upon method of damage mitigation. OJH cannot now ask for further damages under that theory.

## CONCLUSION

[¶ 57] The district court improperly determined the value of Dr. Ford's one share of OJH stock. Because the record is clear, we have been able to calculate the value of Dr. Ford's share as $67,656. The district court was correct in denying OJH's claims for promissory estoppel and breach of fiduciary duty. That part of the judgment is affirmed. The case is remanded for the entry of a new judgment consistent with this ruling.