2012 WY 7A

James M. SCHLINGER, Curtis Excavation, Inc., a Wyoming Corporation, and WW Construction, LLC, a Wyoming Limited Liability Company, Appellants (Defendants),

v.

Christopher M. McGHEE, Jack E. Robinson and Curtis–Westwood Construction, LLC, a Wyoming Limited Liability Company, Appellees (Plaintiffs).

No. S–10–0185.

Supreme Court of Wyoming.

Jan. 18, 2012.

As Amended on Rehearing Feb. 7, 2012.

Representing Appellants: Scott P. Klosterman and Patrick J. Murphy of Williams, Porter, Day & Neville, P.C., Casper, Wyoming. Argument by Mr. Klosterman.

Representing Appellees: J. Denny Moffett of Moffett & Associates, PC, Jackson, Wyoming; and Heather Noble, Jackson, Wyoming. Argument by Ms. Noble.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1]   James Schlinger owns and operates Curtis Excavation, Inc., and WW Construction, LLC. Mr. Schlinger, acting as President of WW Construction, entered into an oral agreement to lease his business and all associated equipment and land to Christopher McGhee and Jack Robinson.  Mr. McGhee and Mr. Robinson formed Curtis–Westwood Construction, LLC (CW Construction) as the entity to lease and operate the business. After  approximately  eight  months,  Mr. Schlinger determined Mr. McGhee and Mr. Robinson were not properly managing the business and terminated the oral lease agreement.  The parties dispute the financial implications of the termination.  After a bench

trial, the district court determined Mr. Schlinger owed Appellees McGhee, Robinson, and CW Construction $206,875.70.

[¶ 2] In the face of the multiple issues raised by Appellants Schlinger, WW Construction and Curtis Excavation, we will affirm in part and reverse in part.

## ISSUES

[¶ 3] Appellants state the issues as:

I. Did the district court err when it found, based on incomplete and unreliable bookkeeping spreadsheets, that defendants owed plaintiffs $206,875.70?

A. Did the district court err in its judicial accounting when it failed to credit defendants with $312,319.12 of business expenses defendants paid for plaintiffs in March, April and May 2004?

B. Did the district court further err when it accepted bookkeeper Barb Fields' unreliable and incomplete "tie out ending balance" number of $206,875.70 as its judicial accounting award?

II. Did the district court err when it awarded pre-judgment interest to plaintiffs where the underlying debt was unliquidated and plaintiffs provided no notice of that required sum to defendants?

III. Did the district court abuse its discretion when it denied defendants' unjust enrichment claims?

A. Did the district court incorrectly reject defendants' $10,800 claim for reimbursement for Jim Schlinger's time and help in running the business from March—August, 2004?

B. Did the district court incorrectly reject defendants' $48,000 claim for reimbursement for bonding two projects for plaintiffs?

C. Did the district court err when it rejected defendants' $26,475 claim for reimbursement of one-half of the salary and bonus paid to employee Michael Mielke?

IV. Should the district court's judgment for $206,875.70 for plaintiffs be reversed, and judgment entered for defendants in the amount of $190,718.42?

## FACTS

[¶ 4] Mr. Schlinger moved to Jackson in the early 1970s. He established WW Construction shortly after arriving in Jackson. In 2000, Mr. Schlinger purchased Curtis Excavation, Inc., to operate in conjunction with WW Construction (both companies will hereinafter be referred to generally as WW Construction). Mr. McGhee and Mr. Robinson had worked for Curtis Excavation as heavy equipment operators since the early 1980s. Both men continued on after Mr. Schlinger bought the company.

[¶ 5] In early 2004, Mr. Schlinger was in the midst of divorce proceedings and was struggling with his physical health. He no longer wanted to deal with the stress of running WW Construction. He therefore approached Mr. McGhee and Mr. Robinson about the possibility of their leasing the equipment, building and land associated with WW Construction from him. As part of the negotiations, Mr. Schlinger stated that, because of their lack of experience running a business, he would be available to help them with any issues that might arise. He also agreed that WW Construction would advance money to CW Construction to pay expenses until CW Construction was sufficiently capitalized. They agreed the lease was to run for two years. After two years Mr. Schlinger would retake the company with the intention of selling it. Since Mr. Schlinger was to retake the company, Mr. McGhee and Mr. Robinson were to alter the business as little as possible. The monthly lease payment was never fixed but was to be in the neighborhood of $21,000.00.

[¶ 6] Although exact terms were never finalized and no written lease was ever signed by the parties, the parties proceeded with a lease relationship. The lease began on March 1, 2004. Mr. Schlinger advanced $40,000 to Mr. McGhee and Mr. Robinson to help them get started and then moved to Montana. At the time, Mr. McGhee and Mr. Robinson were unprepared to take over full operation of the business. CW Construction was not legally established as an LLC until March 8 and it did not acquire a federal employer identification number until June. Thus, throughout March, April and May, all

business continued through WW Construction. WW Construction paid all expenses, including payroll and insurance. Generally, invoices went out on WW Construction letterhead and accounts receivable were deposited in WW Construction's bank account. The bookkeeper that formerly had worked for WW Construction, Kim Coon, continued to keep the books.

[¶ 7] Mr. McGhee and Mr. Robinson hired Mike Mielke as office manager. Mr. Mielke had considerable experience in the construction and excavation industry. Mr. Mielke's employment contract stated that Mr. Mielke would be entitled to no less than ten percent of the profits of jobs with which he was associated. In the beginning, Mr. Mielke needed guidance on how to manage CW Construction. To this end, he regularly contacted Mr. Schlinger for advice.

[¶ 8] CW Construction took over full operation of the business in June. Towards the end of May, it hired Barb Fields as its bookkeeper. Her duties included office accounting, customer billing, paying vendors and employees, and bank reconciliation. When Ms. Fields began, she was unfamiliar with the terms of the lease agreement between WW Construction and CW Construction. She was not even sure which company she worked for. It was very difficult for her to keep track of amounts due between the two companies, although she received some input from Mr. Schlinger as well as Mr. Robinson and Mr. McGhee as to which bank account certain monies should be deposited.

[¶ 9] At some point during the fall, Mr. Schlinger decided Mr. McGhee and Mr. Robinson were not effectively managing CW Construction. He was concerned that they were losing employees and had not generated enough new business. Because of his concerns, he, in his official capacity, determined to resume control of WW Construction. Consequently, the lease ended as of October 31, 2004. At the end of the lease, the parties could not agree on how much was owed between the companies. In an attempt to reconcile the intercompany accounts, Ms. Fields produced an accounting, which she titled a "Tie Out Ending Balance," that stated that WW Construction owed CW Construction $206,875.70. She was not, however, certain that the amount was accurate. Despite Ms. Fields' misgivings, the trial court adopted her accounting and awarded $206,875.70 to Appellees.

## DISCUSSION

### Standard of Review

[¶ 10] This appeal comes to us after a bench trial. The findings of fact after a bench trial are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence. We do not set aside the district court's factual findings unless they are clearly erroneous. *Vision 2007, LLC v. Lexstar Dev. & Const. Co.,* 2011 WY 84, ¶ 8, 255 P.3d 914, 918 (Wyo.2011). Under the clearly erroneous standard, a finding of fact will be overturned only if, although there is evidence to support it, this Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Orthopaedics of Jackson Hole, P.C. v. Ford,* 2011 WY 50, ¶ 31, 250 P.3d 1092, 1100 (Wyo.2011); *Hofstad v. Christie,* 2010 WY 134, ¶ 7, 240 P.3d 816, 818 (Wyo.2010); *Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006). As always, this Court reviews conclusions of law *de novo. Helm v. Clark,* 2010 WY 168, ¶ 6, 244 P.3d 1052, 1056 (Wyo.2010); *Bellis v. Kersey,* 2010 WY 138, ¶ 10, 241 P.3d 818, 822 (Wyo.2010).

### ISSUES I & II—Propriety of Award against Mr. Schlinger and Prejudgment Interest

[¶ 11] The district court ruled that "Mr. Schlinger breached his oral agreement with [Mr. McGhee] and [Mr. Robinson] by failing to pay what was due to them for their operation of CW Construction." Consequently, the district court ordered "that Mr. Schlinger owes Plaintiffs the sum of $206,875.70." The district court's order includes an "accounting

by the Court with respect to how much each party owed the other." Neither party nor the district court cites any statutory authority or case law to establish any specific standards for a judicial accounting under these circumstances. In truth, this case involves competing breach of contract claims.

[¶ 12] "The elements for a breach of contract claim consist of a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages." *Reynolds v. Tice*, 595 P.2d 1318, 1323 (Wyo.1979). On appeal, appellants challenge the sufficiency of the evidence of appellees' damages. In order to be entitled to damages for breach of contract, the plaintiff

> has the burden of producing sufficient evidence to prove his damages. "Damages must be proven with a reasonable degree of certainty, and a court may not resort to speculation or conjecture in determining the proper amount to award." *Capshaw v. Schieck*, 2002 WY 54, ¶ 10, 44 P.3d 47, 52 (Wyo.2002) (quoting *Sannerud v. Brantz*, 879 P.2d 341, 345 (Wyo.1994)) (internal citations omitted).

*Knight v. TCB Const. and Design, LLC*, 2011 WY 27, ¶ 17, 248 P.3d 178, 184 (Wyo.2011).

[¶ 13] The district court awarded damages to the appellees based upon Ms. Fields' tie out ending balance. The district court made the following pertinent findings of fact:

9. From March 2004 through the end of May 2004, Plaintiffs were relying on Kim Coon, bookkeeper for WW Construction, to keep the CW Construction books. At first Ms. Coon was residing in Jackson, but for most of the period she was working on the accounts while out of state. She performed this work until the end of May 2004 when Barbara Fields was hired by CW Construction as an independent contractor to keep the books. Ms. Fields began actively invoicing on behalf of CW Construction, and payments began flowing into the CW account. She continued working for CW Construction through October 31, 2004, and she worked for WW Construction thereafter.

10. In early August 2004, Ms. Fields attempted to disentangle the WW and CW accounts and determine how much CW Construction still owed to WW Construction. Ms. Fields' report (Plaintiffs' Exhibit 116) was based on information from Kim Coon and Mr. Schlinger's spreadsheets, which detailed payments Mr. Schlinger made on behalf of CW Construction during March through June as well as reimbursements from CW during that period. The records were supplemented with financial information accumulated by Ms. Fields since May 2004. The report took into consideration the amount owed by CW to WW from Mr. Schlinger's spreadsheets, deposits to WW from CW receivables that were not recorded on Mr. Schlinger's spreadsheets, and various other adjustments between the two companies. **Ms. Fields' report calculates that, as of August 10, 2004, CW Construction owed Mr. Schlinger $110,927.10.** She also noted that, according to CW spreadsheets, CW Construction owed Mr. Schlinger $94,279.07, a discrepancy of $16,648.03.

11. The Court recognizes the great difficulty of the task in arriving at a reliable figure for the amount owed in August 2004: Both WW and CW accounts were handled for the first three months by a single bookkeeper who was not in Jackson most of the time. WW billed for CW work through the end of May 2004, and payments for CW work were deposited in the WW account. During the same period, March through May 2004, payments for WW work performed prior to March were being received and deposited in the WW account. Every invoice and every deposit required a determination of which company to credit because most transactions were going through the WW account. Meanwhile, CW was also operating through its own account with money advanced by Mr. Schlinger.

12. Both parties expressed confidence in the work of Ms. Fields. Plaintiffs' expert in accounting, Jeff Wilkinson, used Ms. Fields' $110,927.10 figure as a starting point for his analysis of what amount was due to Plaintiffs as of October 31, 2004. Defendants' accounting expert, Carl Kil-

mer, criticized Wilkinson for failing to verify the $110,927.10 figure, but he did not propose an alternate figure. Testimony from Mr. Wilkinson and Ms. Fields revealed two problems with the $110,927.10 figure. Mr. Wilkinson would have adjusted it downward by $30,000 because it included $30,000 in repair deposits charged to CW Construction, which were never put in an escrow account and would have been refunded to CW Construction after the lease if no damages were determined. In her testimony, Ms. Fields noted that $40,000 advanced by Mr. Schlinger and deposited in the CW Construction bank account on March 25, 2004 was not included in the $110,927.10 figure. The Court notes that Mr. Schlinger's second $40,000 advance (6/10/04) also does not appear to be incorporated into the amount owed by CW Construction, although the first payback of $35,000 was included.

\* \* \* \*

14. A second series of calculations [were] made, apparently by Ms. Fields and Mr. Schlinger, of what CW owed WW as of August 31, 2004. (See Plaintiffs' Exhibit 162, a faxed document dated 8/12/04 with additional figuring made in Mr. Schlinger's handwriting.) In that document, the "Total Due to Jim Schlinger" was determined to be $91,755.10, which did not include CW's payment of $40,000 on 8/12/04. The final amount owed WW Construction after subtracting the $40,000 was $51,755.10 as of August 31, 2004. The Court notes that CW wrote a check to WW for exactly $51,755.10 on 9/17/04, apparently to clear that balance due. (Mr. Schlinger's calculation was later challenged by Plaintiffs because it added three months of rent twice, thus overcharging Plaintiffs by $63,234. On the other hand, the Court is not clear as to whether Mr. Schlinger's calculations included the two $40,000 advances).

\* \* \* \*

16. After September 2004, the WW and CW accounts again became entangled, with some checks for CW work being deposited into the WW account, some bills being paid by CW should have been paid by WW Construction and vice versa. At some time after the end of 2004—when Ms. Fields was employed by Defendant—she attempted to determine a "tie out ending balance" of the WW Construction and CW Construction accounts. (See Plaintiffs' Exhibit 136, p. 1466.). **Fields' report shows that on December 31, 2004, WW Construction owed $206,875.70 to CW Construction according to the CW books.** (See also Plaintiffs' Exhibit 136, p. 1468).

(Emphasis in original.) From these facts, the district court concluded:

33. Both parties requested an accounting by the Court with respect to how much each party owed the other, if any. The Court, acknowledging the difficulties in disentangling the accounts of CW Construction and WW Construction, accepts the work of bookkeeper Barbara Fields as a close and reliable estimate. The Court notes that both parties employed Ms. Fields, expressed confidence in her numbers, and used her numbers in their respective profit and loss statements for 2004. **In conclusion, the Court finds that Defendant James Schlinger owed Plaintiffs Christopher McGee and Jack Robinson $206,875.70 as of December 31, 2004.** This is the final "tie out ending balance" calculated by Ms. Fields as per Plaintiffs' Exhibit 136, pages 1467–68.

(Emphasis in original.)

[¶ 14] Appellants argue Ms. Fields' ending balance was too conjectural to be suitably persuasive. Appellees, on the other hand, point out that, under Wyoming law, damages need not be proven with absolute certainty. It is true that absolute certainty is not required; nevertheless, as we stated above, damages do have to be proven with reasonable certainty. The record does not establish that level of certainty; consequently, under the instant facts, appellants have the better argument.

[¶ 15] The problems in this case started early, when the parties employed a remarkable lack of formality in conducting their business affairs. The district court found that Mr. McGhee and Mr. Robinson took over the business as of March 1, 2004; however, because they had not set up a business entity of

their own, they continued to operate through Mr. Schlinger's business entity, WW Construction, for the next three months. Ms. Coon testified that she kept track of all the transactions in WW Construction's books only; she did not even set up any accounts for Mr. McGhee's or Mr. Robinson's business. So, for March through May 2004, revenues and expenses were paid into and out of Mr. Schlinger's business account. Ms. Coon testified that she tried to keep track of the expenses appellants paid on behalf of appellees, but it was very difficult. She stated that she had problems contacting Mr. McGhee and Mr. Robinson to discuss any questions she had about the bookkeeping because they were generally "unavailable." Not surprising considering the lack of clarity in the records, there was no clear explanation at trial of what revenues/expenses tied to which company during the first three months of the lease. Ms. Coon prepared a spreadsheet showing the transactions between the parties. She testified, however, that she was aware of numerous expenses she had missed and she called the spreadsheet a "rough draft."

[¶ 16] Starting in late May or early June 2004, Ms. Fields took over the accounting duties for appellees. She used Ms. Coon's admittedly incomplete accounting as a starting point. Going forward, there still was not much clarity in the business affairs. Ms. Fields stated that there were "a lot of transactions going back and forth.... [T]here was no formal agreement that [she] was aware of."

[¶ 17] Ms. Fields testified that she tried to clean up the "accounting mess" in August 2004, when she prepared a document entitled "Curtis/Westwood Construction, LLC, Amounts Due to Jim Schlinger As of 8/10/04." This document was admitted as evidence at trial as Plaintiffs' Exhibit 116. The number she started with at the top of the balance sheet, $188,974.13 due to Jim Schlinger, was provided by either Mr. Schlinger or Ms. Coon, she did not know which. Ms. Fields then added and subtracted amounts representing items due to or from the appellees. At the end of the August 10th accounting, Ms. Fields came up with two different totals, one based on her calculations, $110,927.10, and the other based on the Curtis/Westwood spreadsheet of $94,279.07. She could not explain the origin of the $94,279.07 figure or the $16,648.03 difference.

[¶ 18] Throughout the lease period, the appellees tendered checks to appellants; however, there was no clear indication in the accounting records of what the checks were meant to cover, i.e., lease payments, reimbursement of expenses appellants paid on behalf of appellees, or loans from appellees to appellants. Mr. Schlinger would apparently direct Ms. Fields to write checks to his company out of the appellees' business account and she would comply. In fact, Ms. Fields testified that, while she was working for the appellees, Mr. Schlinger would call her with questions about the operations of the company and she would "tell him because in [her] mind it was very unclear as who was running the company, who [she] was working for, what the chain of command was."

[¶ 19] At the end of the year, Ms. Fields prepared some documents which seemed to show that appellants owed the appellees $206,875.70. These are the documents the district court relied upon in making its damages award. Ms. Fields explained that she had made the entries largely for tax purposes not believing the balance would be collectable. She stated:

Q. Explain to the Court what document 118 is.

A. Document 118 is generated from Curtis Westwood Construction's books. It is titled, "Note Receivable, Jim Schlinger." And it is my attempt to keep track of these funds that are due to, due from Jim Schlinger and WW construction.

Q. Okay. Now, at the very [sic] three lines up from the bottom there's a general journal entry; do you see that?

A. Yes.

Q. In the amount of $206,875.70; do you see that?

A. Yes.

Q. All right. Explain to the Court what this general journal entry means.

A. A general journal entry is a journal entry that is manually entered and there's

an error in the description, it should say reclass. net due to Jim Schlinger. No, wait, let me see.

\* \* \* \*

Q. So on Exhibit 118 it shows a negative number of $206,875.70; is that right?

A. Yes.

Q. Tell the Court what that means on this document.

A. At the end of the year I was trying to prepare the tax return work papers to give to [the appellees'] CPA firm and this was on their balance sheet as a $206,000 note receivable from Jim Schlinger and in my opinion it was not going to be collectable, I therefore zeroed this out and reclassified it to lease expense.

\* \* \* \*

Q. Okay. With respect to Exhibit 118 reviewing and looking at the number, negative number, $206,875.70 does that reflect an amount of money owed to [the appellees] by Jim Schlinger?

A. I don't know about that. It reflects the amount of money that was in the account at the end of the year.

\* \* \* \*

Q. What's a receiveable?

A. A receivable is an amount due from one person to another.

Q. Okay. And what was the receivable in Exhibit 118?

A. The title on this account is, "Note receivable, Jim Schlinger."

Q. Okay. So [the appellees'] company had a receivable from Jim Schlinger's company; is that right?

A. That's according—I don't know that.

Ms. Fields further testified:

Q. . . . [I]s it fair to say that during the time that you were doing the bookkeeping in 2004 that there was a lot of confusion in your mind about what to do with certain things?

A. Yes.

Q. And is it also true that during the year 2004 that with respect to determining what was due to or due from that at the end of the day you cannot say for sure that this is—that there is a certain amount due or owed by either of the parties; is that true?

A. Yes.

Q. And is it also true that with respect to a number of figures that we've been discussing here today that you just don't have absolute certainty as to the accuracy of all of those entries?

A. That's correct.

Q. One of the numbers or figures that you've been asked about repeatedly was the $206,000?

A. Yes.

Q. And the net reclass., all of those figures, those are things that you just don't have a certainty as to whether or not those figures are correct, true?

A. Yes.

[¶ 20] While absolute certainty is not required to prove damages, reasonable certainty is, and the trial evidence did not provide much assurance about the final number. As reflected above, Ms. Fields and Ms. Coon both testified they were not confident about their numbers. Ms. Fields stated she was confused as to where certain bookkeeping entries should go and that she was not positive about her determination concerning her intercompany accounting. In short, she had doubts as to the certainty of the figures in her ending balance. Based on the testimony of both Ms. Fields and Ms. Coon, then, it is likely there were gaps in the accounting that led to Ms. Fields' ending balance.

[¶ 21] The district court further justified its ruling that Ms. Fields' ending balance was a proper amount of damages to award the appellees by reasoning that it was close to the final number of the accounting expert hired by them. It is not surprising that the numbers were close, since the appellees' expert relied on Ms. Fields' numbers as the starting point for his calculations. He did not conduct an independent audit. As he testified, to the extent Ms. Fields' calculations were inaccurate, his calculations would be inaccurate.

[¶ 22] Under our standard of review, we set aside the district court's factual findings only when they are clearly erroneous. *Vision 2007*, ¶ 8, 255 P.3d at 918. A court is

not, however, permitted to speculate or conjecture when awarding damages. *State Highway Comm'n v. Brasel & Sims Const. Co.*, 688 P.2d 871, 881 (Wyo.1984). After reviewing the entire record, we are left with the definite and firm conviction that the district court made a mistake in awarding damages on this evidence. While we recognize that the district court expended a great deal of effort in analyzing and drawing conclusions from the evidence, it is apparent that it accepted evidence regarding the appellees' damages that lacked a reasonable degree of certainty. Given the speculative nature of the accounting, Ms. Fields' ending balance does not satisfy the quantum of proof necessary to support the district court's damages award. The judgment in favor of the appellees on this claim is reversed.[1] Our resolution of this issue renders Issue II, regarding prejudgment interest, moot.

### ISSUE III—Unjust Enrichment

[¶ 23] Unjust enrichment is the unjust retention of a benefit to the loss of another. It exists as a basis for recovery for goods or services rendered under circumstances where it would be inequitable if no compensation was paid in return. In Wyoming, the elements of unjust enrichment are: 1) valuable services were rendered; 2) to the party to be charged; 3) which services were accepted, used and enjoyed by the charged party; and 4) under circumstances that reasonably notified the party being charged that the other party would expect payment for the services. *Horn v. Wooster*, 2007 WY 120, ¶ 24, 165 P.3d 69, 76 (Wyo.2007); *Jacoby v. Jacoby*, 2004 WY 140, ¶ 10, 100 P.3d 852, 855 (Wyo.2004).

[¶ 24] Appellants make three distinct claims for recovery for unjust enrichment. The first claim is that they should be reimbursed for the time Mr. Schlinger spent consulting with CW Construction. The district court held this claim failed because there was no evidence that Mr. Schlinger ever notified Mr. McGhee or Mr. Robinson that payment was expected for his consulting services. Appellants argue that actual knowledge is not a prerequisite to finding unjust enrichment. They are correct. It is enough if circumstances "reasonably notified the party being charged that the other party would expect payment for the services."

[¶ 25] Nevertheless, Appellants' argument fails. Unjust enrichment is an equitable remedy. As such, it cannot exist where there is an express contract governing the relationship between the parties. *Wagner v. Reuter*, 2009 WY 75, ¶ 13, 208 P.3d 1317, 1322 (Wyo.2009); *Sowerwine v. Keith*, 997 P.2d 1018, 1021 (Wyo.2000). There is no dispute as to the existence of an oral contract for the lease of the business. Mr. Schlinger's willingness to give advice to CW Construction as to running the business was part of that contractual relationship. Thus, whether or not Appellants should receive payment for Mr. Schlinger's consulting services is a contract dispute. An unjust enrichment claim cannot be invoked to bypass terms of a contract.[2] The judgment on this claim is affirmed.

[¶ 26] Appellants' second claim is for compensation they argue is due WW Construction in return for it bonding two jobs for CW Construction. Again, the district court denied the claim because it found no evidence that Mr. Schlinger advised Mr. McGhee or Mr. Robinson that WW Construction expected to be compensated for the bonding. Appellants argue it is generally accepted practice for someone providing bonding to be compensated, thus the circumstances were such that Mr. McGhee and Mr. Robinson were on notice that payment would be expected.

---

1. Appellants also argue that even if this Court affirms the district court's finding that appellees were entitled to a judgment consistent with the $206,875.50 ending balance, we should reduce the judgment by $69,376.28. They claim that amount was incorrectly credited to the appellees when it was actually payment for a job performed by WW Construction outside of the lease agreement. Given we are ruling that the ending balance was not supported by the record and there is insufficient accounting evidence to justify an award to either party, we will not further consider this argument.

2. Should this have been brought as a contract claim, the finding by the district court that the terms of compensation were never discussed would be dispositive.

[¶ 27] We disagree with this contention. We believe the circumstances are such that CW Construction would not reasonably be on notice that WW Construction would demand compensation. The evidence is that CW Construction could not bond the projects itself. Without bonding, it could not bid on the jobs, and it needed the work. Mr. Schlinger wanted CW Construction to succeed. Through WW Construction, Mr. Schlinger had already been very generous financially, paying all CW Construction expenses from March through May. Thus, the fact that Mr. Schlinger agreed to bond the projects without requesting any compensation would not seem remarkable. It would be reasonable to believe WW Construction would not demand any extra compensation.[3] The judgment on this claim is affirmed.

[¶ 28] Appellants' final claim for recovery is for compensation WW Construction paid to Mr. Mielke. After WW Construction cancelled the lease agreement and retook the business, it retained Mielke as an employee. Mr. Schlinger felt that Mr. Mielke had been underpaid while working for CW Construction so immediately doubled his salary. Mr. Schlinger, through WW Construction, also gave Mr. Mielke a bonus and bought him a pickup truck. Mr. Schlinger alleges he did all this because CW Construction had not honored its employment contract with Mr. Mielke regarding Mr. Mielke receiving a share of the profits.

[¶ 29] The district court denied this claim because of a complete lack of proof. No evidence was presented as to Mr. Mielke's involvement with any particular project. There also was no evidence as to the profit margin on any particular project. On appeal, WW Construction simply argues that appellees did not object to the amount he is seeking. This, however, is not the standard. Since it was their claim, appellants had the burden of presenting sufficient credible evidence to support a judicial determination in their favor. They did not do so. The judgment on this claim is affirmed.

### ISSUE IV—Should this Court Award Appellants Damages?

[¶ 30] Appellants present no specific argument in support of their fourth issue. They simply state in the "conclusion" segment of their brief that this Court should amend the judgment, reversing the award to appellees and instead awarding damages to them. This conclusion is based on the arguments they made under Issues I and III regarding their contract and unjust enrichment claims. Given we have already rejected those arguments, we will not further address this issue.

### CONCLUSION

[¶ 31] The district court committed clear error in finding that Ms. Field's ending balance provided a reasonably certain basis to award damages. There is insufficient evidence in the record to justify an award of damages to either party. We reverse the district court's judgment on the appellees' breach of contract claim and reject appellants' argument that they should be awarded breach of contract damages.

[¶ 32] Appellants' various claims for recovery under the theory of unjust enrichment are unsupported by the evidence. The district court judgment on these claims is affirmed.

---

3. There is also a problem with proof. WW Construction asked for ten percent of the bid price as compensation. This does not, however, seem to be industry standard. Mr. Mielke testified that the industry standard, as far as he knew, was more complicated, with no set percentage. According to Mr. Mielke, there typically is an up-front cost of three percent of the bid price. Then, after the job is completed, the percentage would be adjusted based on what happened during the project. WW Construction did not present any evidence of what the actual compensation would be under this formula.